[No. S062562. Apr. 15, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
BRANDON ARNAE TAYLOR, Defendant and Appellant.

584

**COUNSEL**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Alison Pease, Deputy State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly Wilkens and Matthew Mulford, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—In 1996, a San Diego County jury convicted defendant Brandon Arnae Taylor of the first degree murder of 80-year-old Rosa Mae Dixon, forcible rape of an elderly victim while engaged in a residential burglary, forcible oral copulation, residential burglary, and first degree robbery. (Pen. Code, §§ 187, subd. (a), 189, 261, subd. (a)(2), 667.61, subds. (a), (c), (d), 1203.09, subd. (f), 288a, subd. (c), 459, 460, 211, 212.5, subd. (a); unless otherwise specified, all further statutory references are to this code.) The jury also found true the special circumstance allegations that defendant murdered Dixon while committing rape, oral copulation, and burglary. (§ 190.2, subd. (a)(17)(C), (F), (G).) A second jury, impaneled after the first deadlocked on penalty, returned a verdict of death. The trial court denied defendant's automatic application for modification of the death verdict (§ 190.4,

subd. (e)), and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

## I. Facts

### A. *Guilt phase*

#### 1. *Prosecution evidence*

Around 9:30 p.m. on June 23, 1995, 80-year-old Rosa Mae Dixon sat in the living room of her San Diego home conversing with her sister Betty Hayes, who was visiting from Kansas. The women were startled and "scared to death" when they looked up and saw defendant calmly standing in the room staring at them. Defendant, who was 22 years old at the time and lived nearby, apparently had entered the house from the back after tearing a hole through a mesh screen.

After mumbling something that might have been his name, defendant closed the front door over the security screen and sat down on the couch between the two women. When Dixon rose and asked defendant what he wanted, he grabbed the front of her nightgown. At Dixon's direction, Hayes went into the front bedroom to call 911, but when she picked up the telephone, defendant chased after her, jerked the receiver out of her hand, and pulled the cord from the wall. Defendant then grabbed Hayes by her clothing, took hold of Dixon in the same manner, and pushed the two women down the hall to a bedroom in the back of the house.

At some point before defendant forced Dixon and Hayes to the back bedroom, one of the women came outside onto the front porch, yelled for help, and then ran back into the house. Dixon's next-door neighbor, Erik Kirkpatrick, heard the cry and came to investigate. Receiving no response to his knock on the front door, Kirkpatrick went to the side of the house, looked through a window, and saw defendant on his knees hunched over Dixon. After hearing a male voice mumble something like, "I don't want to have to hurt you," and a female voice respond, "Okay, just don't hurt me," Kirkpatrick quickly returned to his own house to call 911 and waited for police to arrive.

Kirkpatrick's momentary look through the side window occurred just as events in the back bedroom had started to unfold. Defendant first pushed Dixon to the floor at the foot of the bed, removed her panties and pulled down his shorts. His first attempt to penetrate her was unsuccessful. He then picked up Dixon and slammed her onto the floor near the side of the bed, banging her head and knocking Hayes to her knees in the process. With more

room to maneuver in the new location, defendant managed repeatedly to penetrate Dixon's vagina with his penis. Meanwhile, Dixon started breathing hard and gasping for air. At one point, defendant withdrew his penis, raised Dixon's head and attempted to place his penis inside her mouth. She resisted, turning her head to the side and saying, "No," while still struggling to breathe. When defendant released Dixon's head and let it drop to the floor a short time later, she was ashen and no longer breathing or moving.

Defendant then turned his attention to Hayes, swinging around to face her with his penis in his hand and asking if she "wanted it." When he did so, Hayes noticed there was semen on the tip of his penis. Defendant pulled up his shorts and started out of the room, passing Hayes's purse, which was sitting open on a table. He dug through it, complaining about finding only a few dollar bills until he discovered and pocketed about $65. Defendant continued on through the kitchen and out the back door.

Defendant got only as far as the back fence before being apprehended by Officers Gassmann and Caropreso, who, along with several other officers, had responded within minutes to Kirkpatrick's 911 call reporting a burglary in progress. When the officers asked defendant why he was in the yard, he first replied he thought the house was vacant. Defendant then offered that a White male named John Hall, who had left before the officers' arrival, "just raped an old woman inside the house." A third officer retraced defendant's route back to the Dixon residence but found no evidence of a second assailant. Less than one hour later, the officers conducted a curbside lineup in the alley behind Dixon's house, and both Hayes and Kirkpatrick identified defendant.

Meanwhile, other officers had discovered Dixon lying on the floor of the back bedroom with her nightgown bunched up around her waist. There was blood on her leg and underneath her pelvic area, and she was unresponsive and not breathing. Rescue efforts, including cardiopulmonary resuscitation (CPR) and emergency heart medications, restored Dixon's pulse, and she was taken to the intensive care unit of a nearby hospital. But she soon suffered seizures and kidney failure and never regained consciousness. The following evening, after being declared brain dead, she was removed from life support.

At trial, Hayes and Kirkpatrick again identified defendant as the man who had entered Dixon's home and sexually assaulted her. The results of DNA testing of blood and sperm collected from Dixon and from defendant at the time of his arrest also identified defendant as the perpetrator. Sperm found inside and on Dixon's body and clothing and on defendant's shirt was consistent with defendant's sperm, and the probability of a random match to the DNA profile was about one in 1,300 African-Americans. Blood on vaginal swabs taken from Dixon and from defendant's penis, hands, and

clothing was consistent with Dixon's blood and not consistent with defendant's blood. More precise testing of the blood established that the probability of a random match to that DNA profile in the general population was one in 400 billion among Caucasians.

The prosecution's medical experts testified that Dixon died from the extreme fear, pain, and stress the sexual assaults caused. Mark Super, M.D., the deputy medical examiner who performed the autopsy, explained that Dixon's natural hormonal responses to the physiological stress and psychological trauma of the struggle and the rape caused her to experience abnormal heart rhythms, which led to cardiac arrest, which in turn deprived her brain of oxygen and ultimately led to her death. He found Dixon's numerous abrasions and bruises to be consistent with a struggle, and he believed the two large tears on the vaginal walls and large accumulation of blood deep inside the vagina to be consistent with forcible rape. In Dr. Super's view, Dixon would not have died when she did but for the sexual assault, although he acknowledged on cross-examination that either vascular or heart disease was a contributing cause of her death, and that a younger woman would have survived the attack.

Cardiologist Thomas Diggs, M.D., who attended to Dixon at the hospital, similarly concluded that Dixon's death was due to cardiac arrest resulting from the stress, fear, and extreme pain the sexual assaults caused. Although Dr. Diggs found nothing in Dixon's medical records suggesting an illness that would have caused her death, he conceded that Dixon suffered from diabetes and high blood pressure, and had once undergone testing that disclosed an enlarged heart. He also acknowledged that it would be possible for fear alone to cause cardiac arrest in an 80-year-old woman.

Nurse Teresa Kinsey, a member of the sexual assault response team (SART) who examined Dixon while she was in critical condition in the hospital's intensive care unit, also testified regarding the extent of Dixon's injuries. She explained that the large amount of blood inside Dixon's vagina indicated she had suffered internal injuries from a "brutal amount of force," and that such injuries more typically occur in a rape involving use of a foreign object like a knife. Kinsey acknowledged, however, that an 80-year-old woman was more likely to be injured during a rape than a younger woman.

Officers and other police department personnel testified regarding defendant's calm and cool demeanor, cooperative manner, and stable mood from the time they placed him in the back of the patrol car shortly after the crimes until they processed and booked him into county jail nearly eight hours later, around 6:00 a.m. the next day. Officers Gassmann and Caropreso described

defendant as calm and cooperative during the curbside lineup. Timothy Jones, the officer who collected a urine sample from defendant approximately two hours after his arrest, recalled that defendant exhibited "normal" mannerisms and "didn't seem upset about the situation at all." Nurse Meredith Jackson likewise found defendant cooperative and able to follow directions while she was collecting sexual assault crimes evidence such as blood, saliva, penile secretions, and pubic hair from defendant around 2:30 a.m. Officer Gaughen, who had custody of defendant at the central police facility from the early morning hours until he was transported to county jail, saw no change in defendant's mood and nothing unusual about his behavior that suggested he needed either medical attention or psychiatric evaluation.

Law enforcement personnel also testified that although defendant's breath smelled mildly of alcohol, his speech and movements appeared to be normal and he exhibited no other signs of intoxication. A breath sample taken from defendant around 5:00 a.m. indicated he had a nominal blood-alcohol level of 0.01 percent. In addition, a comprehensive drug screen of defendant's urine and blood collected near the time of his arrest showed no reportable amounts of methamphetamine, benzodiazepines, cocaine, opiates, antidepressants, barbiturates, or PCP. Separate testing for the presence of LSD in defendant's urine likewise returned no reportable results.

### 2. *Defense evidence*

The defense posited that when defendant entered Dixon's home, he lacked the intent to steal or commit any other felony and, therefore, did not commit a burglary at that point, and that Dixon suffered cardiac arrest not from the sexual assaults, but from the fright of encountering defendant unexpectedly in her living room. In support of that theory, the defense presented the testimony of pathologist Paul Wolf, M.D., who opined, based on Dixon's medical records, that she had preexisting heart disease and had suffered a heart attack at least 10 days before her death, which made her more vulnerable to a cardiac arrest caused by trauma. Dr. Wolf explained that Dixon's fright on seeing defendant in her living room played a large part in the cardiac arrest, but that there was no way to determine as a medical certainty whether Dixon's initial fright or the subsequent pain from the rape caused her to suffer cardiac arrest.

The defense also attempted to show that defendant's long-standing, serious mental illness impaired his ability to form the mental state necessary for first degree murder. The defense retained psychiatrist Mark Cerbone, M.D., to evaluate defendant's mental health. In arriving at a diagnosis, Dr. Cerbone met with defendant for 20 minutes in county jail and reviewed records such as prior psychological assessments, police reports, and summaries of interviews with defendant's mother and others.

Dr. Cerbone's review of the various materials disclosed that defendant had a long history of abusing drugs, including methamphetamine, marijuana, cocaine, and LSD. For instance, defendant began using methamphetamine when he was between the ages of 12 and 14, and for three years ingested a half-gram of the substance daily. At age 16, defendant was twice admitted to an inpatient psychiatric rehabilitation program, where he was diagnosed with polysubstance dependence and given antipsychotic medications to control his behavior, which included threats of violence. During the program, defendant also exhibited paranoid and delusional thinking, such as accusing the facility's psychiatrist of conspiring with his mother to sell his martial arts ideas to the creators of the television series *Teenage Mutant Ninja Turtles*. After defendant's release from the rehabilitation facility the second time, he resumed abusing drugs and alcohol and continued to exhibit paranoid delusions.

Dr. Cerbone opined that defendant suffered from several mental illnesses, including methamphetamine dependence, cannabis dependence, substance-induced psychotic disorder, and psychotic disorders not otherwise specified. He also explained that chronic use of methamphetamine and LSD can cause overreaction to nonexistent threats. Dr. Cerbone acknowledged having testified at a pretrial competency hearing that defendant also suffers from a severe, long-standing antisocial personality disorder, but stated he changed his diagnosis after obtaining additional information, including records indicating that defendant's father suffered from schizophrenia.

Psychopharmacologist Steven Stahl, M.D., testified that a chronic user of methamphetamine often develops paranoia, depression, disordered thinking, and impulsivity. But when a longtime methamphetamine user also ingests LSD, the likelihood he will experience paranoia and psychosis is even greater. And because these substances deplete the brain's stores of neurotransmitters, their behavior-altering effects can exist long after they are eliminated from the body. Moreover, when a chronic abuser of methamphetamine and LSD consumes alcohol, the likely result is paranoia, impulsiveness, and lack of inhibition.

The defense also called forensic and clinical toxicologist Randall Baselt, Ph.D., who analyzed the urine sample collected from defendant shortly after his arrest. According to Dr. Baselt, the sample showed the presence of LSD and amphetamine, but no reportable level of methamphetamine. Dr. Baselt also concluded by extrapolation that, at the time of the crimes, defendant's blood-alcohol level was between 0.12 to 0.14 percent.

B. *Penalty phase*

1. *Prosecution evidence*

After the jury that convicted defendant deadlocked on penalty, the trial court declared a mistrial and impaneled a second jury. Because the prosecution based its case in aggravation largely on the circumstances of the crimes, the new jury heard much of the same testimony the prosecution had presented at the guilt phase. Thus, Hayes and Kirkpatrick again described the events inside Dixon's home that had caused her cardiac arrest and subsequent death. Medical experts testified, as they did at the guilt phase, about the extent of Dixon's injuries and the cause of her death. Likewise, police officers and other forensic professionals repeated their earlier testimony about defendant's arrest, his calm, cooperative demeanor, and the results of DNA and toxicology testing of defendant's semen, blood, and urine, which identified defendant as the perpetrator of the sexual assaults and showed no reportable amounts of methamphetamine, LSD, or any other controlled substance.

The prosecution also presented evidence of four instances of prior violent conduct or threats of violence. Twenty-year-old Jason L. testified that defendant had sexually assaulted him as a youth. Jason, his mother, defendant, and defendant's mother lived together as a family for about eight years. While at home alone one day after school when Jason was eight and defendant was 12 or 13, defendant asked Jason to masturbate and orally copulate him, and then threatened him with a steak knife when he refused. After Jason acquiesced and orally copulated defendant, defendant sodomized him, telling the sobbing child to scream into a pillow if it hurt and to calm down, "like nothing had happened." Defendant then dictated a note for Jason to write, describing the incident and promising never to talk about it, which defendant took from him and kept. Jason later told his mother what happened, and she told defendant's mother, but the matter went no further.

Testimony by police and sheriff's deputies described defendant's violent encounters with law enforcement on two occasions. Less than one year before committing the capital crimes, defendant confronted a plainclothes officer who made eye contact with him on a downtown San Diego sidewalk. Defendant angrily threatened, "I will fuck you up," when the officer denied defendant's accusation that he was staring at him. Defendant also violently resisted efforts to move him to a new cell while he was being held in San Diego County jail awaiting trial in the case. In that incident, six deputies removed defendant from his cell using pepper spray and an electrically charged shield after he disobeyed an order to relocate to a different cell module. Defendant ultimately walked out of his cell, but then lowered his head, raised his fists in the air, and charged at the officers, breaking free of their hold and running some 500 feet before finally being subdued.

As a fourth incident of prior violent conduct, through a stipulation, the prosecution presented evidence that defendant, upon hearing his former counsel express doubt about his competence to proceed to trial, sprang out of his chair, lunged at her, and called her a vulgar name, but did not strike her.

The prosecution placed into evidence an American Red Cross adult CPR certification card issued to defendant that was found in his pocket at the time of his arrest. Captain Burson of the Placer County Fire Department, who was the instructor of a CPR and first aid class defendant attended six months before committing the capital crimes, testified that defendant received an "A" in the course, which had included instruction on how to recognize the signs and symptoms of shock and respiratory distress.

The prosecutor also called numerous witnesses to testify about the impact of Dixon's death on her family, friends, and the community at large.

### 2. Defense evidence

The defense presented an extensive case in mitigation that emphasized the unconventional, unconstrained, and disruptive upbringing that hindered defendant's normal development into adulthood, and the continual decline in defendant's mental health that was manifested by his drug addiction and significant changes in his behavior as a youth.

Defendant's mother, Pauletta Taylor, testified that she moved from the East Coast to San Diego with defendant when he was six years old. When defendant was about eight years old, they began residing with Taylor's partner, Rosemary L., and L.'s young son Jason L. Rosemary L. considered herself a "second mother" to defendant, but disciplined him harshly and often used drugs in front of him, including LSD and methamphetamine. By the time defendant was 14 years old, he had gone from smoking marijuana with school friends to using heavier drugs such as PCP, methamphetamine, and cocaine with a tougher crowd, sometimes disappearing for days at a time.

Taylor told the jury she sought help for her son's drug problem by committing him to Harbor View Hospital, an inpatient rehabilitation facility. Defendant complained bitterly about how he was being treated there and eventually persuaded his mother to let him come home. But after defendant reverted to his former behavior, Taylor again committed him to Harbor View. Later, during a family therapy session at the facility, Taylor disclosed to defendant that he had been conceived as a result of his father raping her. Defendant, who was already upset about his mother's lesbian lifestyle and his father's absence, was devastated by the disclosure of the circumstances of his conception because it shattered his dream that his parents would someday reunite.

As Taylor further explained to the jury, following defendant's second release from Harbor View, they moved from San Diego's Ocean Beach area to the North Park area in the hope that the new environment would help defendant stay away from drugs. After the move, however, defendant's behavior changed significantly. He spent most of his time in his bedroom with the blinds drawn and the lights off, and complained that neighbors and strangers were watching and filming him. When defendant did interact with others, he would often stare at them or become confrontational. He was also delusional. For example, he continued to insist that Taylor and Dr. Sambs, the treating psychiatrist from Harbor View Hospital, had sold defendant's martial arts movies to the producers of *Teenage Mutant Ninja Turtles*. Finally, after an incident in which defendant wrestled with Taylor over a shotgun and locked himself in the bathroom, Taylor ordered him to move out, and he started living on the streets or in a shelter. Defendant later moved back in with his mother and her partner and was sometimes employed, but only for short periods of time.

Numerous witnesses who had known defendant at various points in his youth and young adulthood likewise testified about the substantial changes in his behavior over time. For instance, a former girlfriend testified that in seventh grade defendant was a nice and understanding person, dressed well, and was optimistic about life, but that when she saw him several years later, he was dirty, disheveled, and sad and hopeless about his life. Friend and neighbor Melville Goot, who had hired defendant to be the doorman at his short-lived downtown San Diego jazz club, testified that defendant sometimes said strange, childlike things, like suggesting the Power Rangers might be able to help them. Several witnesses related incidents in which defendant would get a "glassy look" and disappear mentally. Others observed that, while watching movies or television shows, defendant would often converse with himself or laugh inappropriately. Still other witnesses described incidents in which defendant lost control and became confrontational and violent over seemingly trivial matters, and then walked off as if nothing had happened.

The defense presented the testimony of three experts to explain the sources and nature of defendant's mental illness and developmental deficiencies. Psychiatrist Samuel Benson, M.D., had evaluated defendant at the defense's behest, first for purposes of competency and later for the penalty phase. Dr. Benson opined that defendant suffers from paranoid schizophrenia and substance abuse. According to Dr. Benson, defendant has exhibited all of the symptoms of schizophrenia, including hallucinations, delusions, psychotic denial and paranoia, emotional and social withdrawal, and severe difficulties with abstract thinking. Dr. Benson also explained that in the initial stages of schizophrenia, which typically occur during late adolescence or early adulthood, the symptoms wax and wane.

Dr. Benson disagreed with other mental health experts who had diagnosed defendant as having antisocial personality disorder, and he noted that several of the treating psychiatrists had prescribed strong antipsychotic medications for defendant. Furthermore, Dr. Benson explained, his own present diagnosis was based on information the other experts lacked, including the medical records of defendant's father, who likewise suffered from schizophrenia.

A specialist in addiction medicine, Alex Stalcup, M.D., concurred in Dr. Benson's diagnosis of schizophrenia and testified about the relationship between drug addiction and mental illness. Dr. Stalcup's review of defendant's family background and mental health history showed all of the risk factors that predispose an individual to both schizophrenia and drug addiction: a family history of addiction, mental illness, and trauma (in defendant's case, his early exposure to drugs and discomfort with his mother's homosexuality). According to Dr. Stalcup, schizophrenics often use methamphetamine because it gives them a feeling of pleasure that their mental illness prevents them from experiencing, and a schizophrenic who is under the influence of that substance might seem normal because the drug increases focus and energy.

Like Dr. Benson, Dr. Stalcup disagreed with the mental health experts who diagnosed defendant as having an antisocial personality disorder. As Dr. Stalcup explained, a paranoid schizophrenic may exhibit antisocial behavior, such as rudeness, speaking out of turn, and making threats. But whereas an individual with an antisocial personality is cold, calculating, and directed by self-gratification, a schizophrenic suffers from a psychosis and delusions that make him feel threatened, persecuted and anxious. In Dr. Stalcup's opinion, defendant's behavior was impulsive, not manipulative, and he consistently acted in a counterproductive way that did not benefit him.

Psychologist/sociologist Nathan Hare, Ph.D., testified regarding the impact of society on the development of African-American males. Based on a review of defendant's family and medical history, Dr. Hare concluded that defendant's developmental progress had been substantially hindered by a number of factors, including the instability of his early childhood, his father's absence, his shame over his mother's homosexuality, and his exposure to drugs and abuse at the hands of his mother's partner. Because of defendant's arrested development, he lacked social skills and the ability to deal with authority, and he had no sense of identity. According to Dr. Hare, these deficiencies set up defendant for failure in the other stages of development and led to his self-imposed isolation, during which time he experienced delusional thinking.

The defense again called its own experts to testify about the extent of Dixon's injuries and cause of her death. Dr. Wolf testified, as he had at the

guilt phase, that Dixon may have suffered a series of small, undetected heart attacks related to her diabetes well before the sexual assaults. Emergency medicine physician Steven Gabaeff, M.D., testified that Dixon's long-standing history of atrophic vaginitis, which is characterized by thin and dry vaginal mucosa, made her vagina more susceptible to tearing from the sexual assaults.

Finally, the defense presented testimony on the appropriateness of imposing a sentence of life without the possibility of parole. Former correctional officer James Esten testified that an inmate convicted of special circumstance murder is automatically confined in a prison with the highest security level, under direct and constant observation by correctional staff. Based on information he received from the defense team and his own meeting with defendant, Esten believed defendant would pose no threat to other inmates or prison staff if confined in such a setting for life.

### 3. *Prosecution's rebuttal*

In rebuttal, the prosecutor presented three mental health experts who challenged the defense evidence relating to defendant's mental illness. Forensic psychiatrist Steven Ornish, M.D., testified that he had reviewed all of the records in the case and found no evidence the crime was the result of a psychosis or a delusion; rather, it was committed purposefully by someone with predatory, antisocial traits. Although conceding there was some evidence defendant had exhibited symptoms of psychosis, Dr. Ornish attributed such behaviors to defendant's use of LSD and methamphetamine, which can mimic the symptoms of schizophrenia.

Psychiatrist William Hocter, M.D., who treated defendant when he was in county jail during the prosecution of his case, testified about defendant's mental health during that period of time. Defendant exhibited no symptoms of schizophrenia and, until three months before the penalty retrial, denied he suffered from the illness or needed treatment. Then, in February 1997, defendant gave Dr. Hocter a "laundry list" of his symptoms and requested medication. Based on defendant's description of his symptoms, some of which Dr. Hocter found "unusual," Dr. Hocter ruled out malingering and diagnosed defendant as suffering from a psychotic disorder not otherwise specified.

The prosecution's rebuttal concluded with the testimony of clinical and forensic psychologist Gregg Michel, Ph.D., one of the court-appointed mental health experts who had evaluated defendant for purposes of a competency hearing. In his report for that proceeding, Dr. Michel had diagnosed defendant as malingering and having an antisocial personality disorder, and he saw nothing suggesting defendant suffered from schizophrenia.

## II. Discussion

### A. *Pretrial denial of requests for substitution of trial counsel*

Six times before trial, defendant requested, or appeared to request, substitution of his appointed counsel. The trial court denied all but the final request. Defendant now challenges these rulings. We conclude, however, that the trial court did not err in failing to replace defendant's counsel earlier in the proceedings.

The San Diego County Public Defender's Office first represented defendant in this case, but withdrew within weeks of the appointment based on a conflict of interest. The trial court then appointed Mary Ellen Attridge of the office of the San Diego County Alternate Public Defender to represent defendant.

Six months later, at a pretrial hearing on January 25, 1996, Attridge told the trial court that defendant might not be competent to stand trial and requested a competency hearing pursuant to section 1368.[1] Attridge indicated defendant was uncooperative, uncommunicative, delusional, and paranoid, and had told her he was experiencing auditory and visual hallucinations. When defendant responded that he believed counsel had "turned against [him]," Attridge asked that the prosecutor be excused from the courtroom. The trial court dismissed the request, saying, "this is not a *Marsden* hearing."[2] Nonetheless, defendant continued to complain about counsel, calling her "insubordinate" and claiming he had "asked her constantly to do what I say as an attorney and [she had] not."

As defendant continued to complain, counsel attempted to talk over him so as to prevent his comments from appearing on the record. The trial court quickly interceded, declared a doubt as to defendant's mental competence, and ordered the proceedings suspended. In response to the trial court's ruling, defendant stated: "Excuse me, Judge. I have fired this attorney." The trial court brushed aside the comment, stating, "I know you have," and proceeded to schedule the mental competency evaluation. After the trial court set an evaluation date and ended the hearing, defendant rose from his chair, lunged at Attridge, and yelled, "You have no client, you fucking cunt."

---

[1] Section 1368 requires the trial court to conduct a hearing to determine a defendant's present mental competence if "a doubt arises in the mind of the judge as to the mental competence of the defendant" (*id.*, subd. (a)) or "[i]f counsel informs the court that he or she believes the defendant is or may be mentally incompetent" (*id.*, subd. (b)).

[2] *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].

At a subsequent hearing one month later on February 22, 1996, the trial court indicated it had reviewed and agreed with a report by the court-appointed psychologist, Dr. Gregg Michel, who concluded that defendant suffered no mental infirmities that rendered him incompetent to stand trial. When defense counsel requested jury trial on the issue and asked to make an offer of proof outside of the prosecutor's presence, the trial court granted the request.

Following defense counsel's offer of proof, the trial court asked defendant if he understood what was happening. Defendant replied, "So far my attorney believes that I am incompetent and for that reason I decide that I need another attorney." The trial court reminded defendant that another attorney, John Lee, had been added to the defense team to help resolve defendant's apparent dissatisfaction with lead counsel. But defendant was not appeased, noting, "Mr. Lee works with Mrs. Attridge and . . . [w]e don't get along at all." Defendant reiterated that he did not believe Attridge could represent him, and referred to her as "insubordinate" and "rude." The trial court responded, "Because of the mental competence problem, I do not feel a *Marsden* [hearing] would be proper at this point so we have to settle the 1368 problem and then we'll handle the *Marsden* problem."

Later in the hearing, with the courtroom now reopened to the public and the prosecutor present, defendant renewed his request for another attorney, saying, "I no longer accept her legal advice." The trial court indicated that it would not change counsel at this point, but defendant persisted, blurting out, "They are all against me" and "She is not helping me." However, the trial court ignored defendant's remarks and conferred with the attorneys about various issues concerning the competency trial.

The parties were in court again the next day to select their experts and set competency trial dates. Once those arrangements had been made, the prosecutor brought to the trial court's attention legal precedent establishing that a defendant seeking substitution of counsel is entitled to a *Marsden* hearing even when proceedings have been suspended under section 1368. Confirming with defendant that he wanted a hearing to determine whether new counsel would be appointed, the trial court cleared the courtroom except for defendant and his counsel.

At the *Marsden* hearing, defendant detailed his complaints about counsel. According to defendant, counsel was providing him with misleading legal advice and lashing out at him when he asked for something. He called her "brutal" and "insubordinate" and claimed she ignored his requests, including his request for a speedy trial.

Upon the trial court's request for a response, counsel first expressed the view that defendant's dissatisfaction was based on a mental defect. She had no idea what defendant meant by "lashing out" and believed he called her "insubordinate" because she expressed a doubt as to his competence. As for not acceding to his requests, counsel explained that she refused to give defendant a copy of the police report in his case because she feared it might fall into the hands of another inmate who would use it to testify falsely against defendant. Regarding defendant's demand for speedy trial, counsel indicated that the case was not ready to go to trial and she believed defendant was more lucid when he initially agreed to waive his speedy trial rights. Defendant declined the trial court's invitation to reply to counsel's explanation, stating, "She said it all."

Finding no breakdown in the attorney-client relationship and no reason counsel could not adequately represent defendant in the future, the trial court denied defendant's motion for substitution of counsel. It remarked that counsel was highly competent and well respected, and expressed the view that any problems between attorney and client were the result of defendant's willful and defiant attitude or a mental problem, whether feigned or not.

On April 8, 1996, the section 1368 trial began. Initially, the parties prepared for a jury trial. However, after the noon recess, counsel announced she would waive defendant's right to a jury trial. Defendant objected, and again expressed his dissatisfaction with counsel. When the trial court explained to defendant that the law permitted counsel to waive a jury, even against his wishes, defendant responded: "I fired her. I have constantly repeated that she is not my attorney." The trial court reminded defendant, "You do have an attorney." But defendant took issue with the trial court, saying, "No I don't, [not] one that will defend or represent me in the manner that I need to be represented."

One week later, on April 15, 1996, the trial court determined that defendant was competent to stand trial and ordered reinstatement of criminal proceedings. The parties then discussed setting the guilt phase trial for a date in July. Noting that July was three months away, defendant asked how long it would be before he could see another attorney. He stated that the trial court's competency finding "means I can fire [trial counsel] now." After defendant confirmed he wanted another attorney, the trial court cleared the courtroom and conducted a second *Marsden* hearing.

At this hearing, defendant reiterated his earlier assertion that counsel was "not representing" him. He complained that the competency hearing was a proceeding he had not wanted. "Things that she said to you," defendant remarked, "my public defender would have not. . . . My public defender would not have questioned my sanity."

The trial court found insufficient grounds to relieve defense counsel of her appointment and denied defendant's motion for substitution of counsel. However, the next morning, April 16, it reconvened with defendant and his counsel and announced it had changed its mind regarding the *Marsden* motion. The trial court noted that it had conducted the competency hearing at defense counsel's request over defendant's objection, and that both members of the defense team had testified about their contacts with defendant. Given these developments, the trial court found more validity to defendant's asserted distrust of his attorney. In the trial court's view, although counsel had handled the case appropriately, the attorney-client relationship had deteriorated and the breakdown warranted appointment of new counsel.[3]

Defendant claims the trial court abused its discretion by refusing to grant his request to substitute counsel until April 16, after the competency hearing, and that the error resulted in an unreliable competency hearing. He argues that despite his repeated and clear expressions of distrust of counsel and desire for a new attorney, the trial court first ignored, then never fully addressed, his concerns over an irreconcilable breakdown in the attorney-client relationship.

When a defendant seeks substitution of appointed counsel pursuant to *People v. Marsden, supra*, 2 Cal.3d 118, "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." (*People v. Smith* (2003) 30 Cal.4th 581, 604 [134 Cal.Rptr.2d 1, 68 P.3d 302]; see also *People v. Hart* (1999) 20 Cal.4th 546, 603 [85 Cal.Rptr.2d 132, 976 P.2d 683].)

We review the denial of a *Marsden* motion for abuse of discretion. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085 [74 Cal.Rptr.2d 121, 954 P.2d 384].) Denial is not an abuse of discretion "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." (*People v. Smith, supra*, 30 Cal.4th at p. 604.)

The trial court did not abuse its discretion in denying defendant's request for substitution of counsel on February 23, before the competency hearing. Immediately upon being apprised of its duty to conduct a *Marsden* hearing even though it had suspended the proceedings pursuant to section 1368, the

---

[3] The court reappointed the San Diego County Public Defender's Office to represent defendant.

trial court provided defendant with an opportunity to air his complaints. After then considering counsel's responses to each of defendant's grievances, the trial court was entitled to credit counsel's explanations and to conclude that defendant's complaints were unfounded. (*People v. Smith* (1993) 6 Cal.4th 684, 696 [25 Cal.Rptr.2d 122, 863 P.2d 192].) For instance, the trial court reasonably could find that counsel had properly refused to provide defendant with the police reports in his case because of concern the documents would fall into the hands of a would-be jailhouse informant who might use the police reports to fabricate evidence against defendant. The trial court reasonably could conclude, moreover, that replacement of counsel was not required because any deterioration in the attorney-client relationship that had occurred was due to defendant's willful, defiant attitude or to a mental problem that was either feigned or real. "[A] defendant may not force the substitution of counsel by his own conduct that manufactures a conflict." (*Ibid.*)

Defendant posits that the trial court's decision to replace counsel after the competency hearing supports his argument that it should have ordered substitution before commencing the hearing. Indeed, he asserts, if his cursing and lunge at counsel did not irretrievably damage the attorney-client relationship, it is hard to imagine anything that would. Contrary to defendant's suggestion, however, heated words alone do not require substitution of counsel without a showing of an irreconcilable conflict. (*People v. Smith, supra,* 6 Cal.4th at p. 696.) And whereas defendant's earlier requests for new counsel were supported by generalized expressions of distrust and dissatisfaction, the competency hearing both crystallized and validated the reasons for his distrust. The trial court could reasonably conclude that allowing counsel to continue to represent defendant after testifying against him at a competency hearing held against his wishes would substantially impair defendant's right to the effective assistance of counsel. But the trial court's decision to replace counsel at that point does not call into question its earlier denial of defendant's *Marsden* motion. The mere " 'lack of trust in, or inability to get along with,' " counsel is not sufficient grounds for substitution. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1070 [25 Cal.Rptr.2d 867, 864 P.2d 40].) Nothing in the record supports defendant's assertion that a desire to expedite trial drove the trial court's refusal to substitute counsel before the competency hearing.

■ We agree with defendant that the trial court erred when it brushed aside his initial requests for substitution of counsel in the belief that the question of defendant's competence to stand trial first had to be resolved.[4] "[W]hile the trial court may not 'proceed with the case against the defendant'

---

[4] After the denial of defendant's first *Marsden* motion, on February 23, 1996, a *Marsden* hearing was not required on April 8, 1996, when defendant had a brief exchange with the trial court in which he again insisted that Attridge was not his attorney. A trial court is not required

before it determines his competence in a section 1368 hearing [citation], it may and indeed *must* promptly consider a motion for substitution of counsel when the right to effective assistance 'would be substantially impaired' if his request were ignored. [Citation.]" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 88 [270 Cal.Rptr. 817, 793 P.2d 23].)

However, contrary to defendant's assertion, the trial court's error does not compel reversal. This is not a case like *People v. Solorzano* (2005) 126 Cal.App.4th 1063 [24 Cal.Rptr.3d 735], in which the trial court refused to hold any *Marsden* hearing until *after* the results of a competency hearing. In *Solorzano*, the defendant's complaints about his counsel pertained to counsel's deficiencies in handling the competency hearing, at which, over the defendant's objection, he was adjudged competent. On these facts, the Court of Appeal concluded it could not find beyond a reasonable doubt that the error had not affected the competency hearing's outcome. (*Id.* at pp. 1069–1071.) Here, by contrast, the trial court conducted a first *Marsden* hearing in which defendant communicated his complaints about counsel *before* the competency proceedings occurred, and as previously discussed, the trial court did not abuse its discretion in refusing substitution of counsel at that point. Defendant thus fails to show that the trial court's initial failure to hold a *Marsden* hearing prejudiced him.

The facts here closely resemble those in *People v. Govea* (2009) 175 Cal.App.4th 57 [95 Cal.Rptr.3d 511], in which the Court of Appeal concluded that the trial court's error in refusing the defendant's requests for a *Marsden* hearing while criminal proceedings were suspended under section 1368 was not prejudicial. There, as here, the defendant claimed he had a conflict with his attorney after counsel declared a doubt as to the defendant's competence, and he made numerous requests for substitution of counsel. (*People v. Govea, supra*, at pp. 59–61.) Although the trial court initially refused to consider the defendant's grounds for seeking new counsel, it conducted a *Marsden* hearing before the competency proceeding and did not abuse its discretion in denying the defendant's request for substitution of counsel at that time. (*Govea*, at p. 62.) Like the trial court in this case, the trial court in *Govea* ultimately found the defendant competent and appointed new counsel. Given that the "trial court gave defendant everything he sought," the Court of Appeal concluded, the trial court's delay in conducting a *Marsden* hearing did not prejudice the defendant. (*Govea*, at p. 62.) We reach the same conclusion here.

to conduct a *Marsden* hearing each time a defendant makes the same complaint about counsel. (*People v. Clark* (1992) 3 Cal.4th 41, 104 [10 Cal.Rptr.2d 554, 833 P.2d 561].)

### B. *Jury selection issues*

#### 1. *Constitutionality of death qualification process*

Defendant contends that California's procedure for selecting jurors in capital cases violates his rights under the federal and state Constitutions. As explained below, many of defendant's contentions are similar to those we have previously rejected, and we find no grounds for revisiting our prior holdings. As to those assertions we have not previously addressed, none casts doubt on the constitutionality of California's death qualification process.

■ Under the due process clause of both the federal and state Constitutions, a capital defendant is entitled to an impartial jury at the guilt and penalty phases of trial. (*People v. Martinez* (2009) 47 Cal.4th 399, 425 [97 Cal.Rptr.3d 732, 213 P.3d 77]; *People v. Blair* (2005) 36 Cal.4th 686, 741 [31 Cal.Rptr.3d 485, 115 P.3d 1145].) "To achieve the constitutional imperative of impartiality, the law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment 'would "prevent or substantially impair the performance of his [or her] duties as a juror" ' in accordance with the court's instructions and the juror's oath. [Citations.]" (*Blair, supra,* at p. 741.) "Death qualification" in a capital case is thus an inquiry into whether the prospective juror's views and attitudes would interfere with his or her ability to " ' "faithfully and impartially apply the law in the case." ' " (*People v. Abilez* (2007) 41 Cal.4th 472, 498 [61 Cal.Rptr.3d 526, 161 P.3d 58].)

As defendant acknowledges, both this court and the United States Supreme Court have concluded that death qualification and the removal of prospective jurors who would automatically vote for death or for life do not violate the constitutional right to an impartial jury. (See *People v. Ashmus* (1991) 54 Cal.3d 932, 956–957 [2 Cal.Rptr.2d 112, 820 P.2d 214]; *Lockhart v. McCree* (1986) 476 U.S. 162, 176–177 [90 L.Ed.2d 137, 106 S.Ct. 1758].) Defendant contends, however, that current empirical studies conclusively establish that death qualification results in a jury that is more prone to convict and to vote for death, thus undermining the reasoning of those prior decisions. We have previously considered the studies defendant cites and found them inadequate to warrant disturbing our precedent. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1120 [12 Cal.Rptr.3d 592, 88 P.3d 498]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1198–1199 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; see also *Lockhart v. McCree, supra,* 476 U.S. at p. 173 [assuming for purposes of the opinion that empirical studies adequately establish death qualification produces more conviction-prone juries, but upholding the constitutionality of death qualification nonetheless].) We reach the same conclusion here.

We also follow our prior decisions in rejecting defendant's contention that death qualification violates his right to a jury selected from a representative cross-section of the community. (*People v. Avena* (1996) 13 Cal.4th 394, 412 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; see also *Lockhart v. McCree, supra,* 476 U.S. at pp. 173–177.) And we reject defendant's further assertion that death qualification violates his right to a representative jury because empirical studies show that the process results in a disproportionate number of ethnic minorities, women, and religious individuals being removed from capital juries. As the high court explained in rejecting a defendant's claim of an unrepresentative jury, unlike the impermissible removal of ethnic minorities or women from jury service, " '[d]eath qualification' . . . is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial. There is very little danger . . . that 'death qualification' was instituted as a means for the State to arbitrarily skew the composition of capital-case juries." (*Lockhart v. McCree, supra,* at pp. 175–176, fn. omitted.)

██ None of defendant's remaining challenges to the death qualification process requires extended discussion. Contrary to defendant's assertion, the prosecution did not violate his constitutional rights by using peremptory challenges against "death qualified" prospective jurors who had expressed skepticism about the death penalty. (*People v. Avila* (2006) 38 Cal.4th 491, 557–559 [43 Cal.Rptr.3d 1, 133 P.3d 1076]; *People v. Pride* (1992) 3 Cal.4th 195, 230 [10 Cal.Rptr.2d 636, 833 P.2d 643].) Nor does death qualification provide prosecutors an impermissible advantage by obtaining conviction-prone juries. (See *Lockhart v. McCree, supra,* 476 U.S. at pp. 175–176 [finding it unlikely that death qualification skews the composition of capital juries in the state's favor].) Defendant's Eighth Amendment challenge to death qualification is in essence a restatement of his claims under other constitutional provisions, which, as in *People v. Johnson* (1992) 3 Cal.4th 1183, 1212–1213 [14 Cal.Rptr.2d 702, 842 P.2d 1], we find lacking in merit. We likewise find flawed the premise underlying defendant's assertion that death qualification, by eliminating the segment of the community that opposes the death penalty, skews the data courts typically rely on to determine "evolving standards of decency" for Eighth Amendment purposes. Through the death qualification process, individuals may be excused not only for their unyielding opposition to capital punishment but also for their intractable support of it. (*People v. Lewis* (2008) 43 Cal.4th 415, 482 [75 Cal.Rptr.3d 588, 181 P.3d 947]; *People v. Blair, supra,* 36 Cal.4th at p. 741.) We reject defendant's contention that death qualification is irrational because it disqualifies individuals based on their moral beliefs when the penalty phase determination is " 'inherently moral and normative.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 263 [133 Cal.Rptr.2d 18, 66 P.3d 1123], quoting *People v.*

*Rodriguez* (1986) 42 Cal.3d 730, 779 [230 Cal.Rptr. 667, 726 P.2d 113].) Disqualified jurors are properly excused for cause, not on the basis of their personal, moral beliefs regarding the death penalty, but because of their inability to "temporarily set aside their own beliefs in deference to the rule of law." (*Lockhart v. McCree, supra,* 476 U.S. at p. 176; see *People v. Stewart* (2004) 33 Cal.4th 425, 446 [15 Cal.Rptr.3d 656, 93 P.3d 271] [a juror's personal opposition to the death penalty is not a permissible basis for excluding him from a capital case jury].)

### 2. *Constitutionality of Code of Civil Procedure section 223*

In several pretrial motions pertaining to jury selection, defense counsel requested that the attorneys, in addition to the court, conduct sequestered voir dire. The trial court denied the motions, noting that "[v]oir dire is to be done by the judge unless the court does find good cause," and concluding that counsel had not shown good cause.

■ The voters enacted Code of Civil Procedure section 223 (section 223) in 1990 by passing Proposition 115. (As added by Prop. 115, § 7, approved by electorate, eff. June 6, 1990.) When first enacted, the statute abrogated the former rule requiring individual, sequestered voir dire in capital cases (*People v. Waidla* (2000) 22 Cal.4th 690, 713 [94 Cal.Rptr.2d 396, 996 P.2d 46]), and allowed attorney-conducted voir dire only on a showing of good cause.[5]

Defendant contends that the version of section 223 in effect at the time of his trial violated the equal protection clauses of the federal and state Constitutions because it placed voir dire in criminal cases in the trial courts' hands while Code of Civil Procedure section 222.5 authorized attorneys for *civil* litigants to question prospective jurors without having to make a good cause showing.[6]

As defendant acknowledges, we have previously rejected the same equal protection challenge to section 223. (See, e.g., *People v. Robinson* (2005) 37

---

[5] At the time of defendant's trial, section 223 provided: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases. . . ."

[6] Effective January 1, 2001, after the trial in defendant's case, the Legislature amended section 223 to provide counsel in criminal cases a limited right to question prospective jurors without having to make a showing of good cause. (Stats. 2000, ch. 192, § 1; see *People v. Stewart, supra,* 33 Cal.4th at p. 455, fn. 18.)

Cal.4th 592, 613 [36 Cal.Rptr.3d 760, 124 P.3d 363]; *People v. Ramos* (2004) 34 Cal.4th 494, 511–513 [21 Cal.Rptr.3d 575, 101 P.3d 478].) We decline to revisit the issue here. (*People v. Ramos, supra,* at p. 512 [strict scrutiny is inapplicable because the right to voir dire is not based on the Constitution; differences in voir dire procedures are reasonably related to the former statute's legitimate purpose of curbing jury selection abuses in criminal cases].)[7]

### 3. *Manner of conducting voir dire*

As previously noted, the trial court impaneled two juries in this case. The first convicted defendant as charged and found true the three special circumstance allegations, but deadlocked on penalty. The second, which the trial court impaneled for retrial of the penalty phase, returned a verdict of death. Below, we address defendant's claims regarding the first jury's selection. In a later section (see *post,* pt. II.D.2.), we will consider defendant's challenge to selection of the jury that decided penalty.

### a. *Denial of motion for individual sequestered voir dire*

Defense counsel filed several pretrial motions concerning the voir dire of prospective jurors. In one, counsel asked that voir dire be done either individually and sequestered or in small groups of 15 to 20 prospective jurors. Counsel argued that individual voir dire was necessary to probe the strong biases the circumstances of the case—a young African-American man accused of committing sexual assaults that caused the death of an elderly White woman—were likely to evoke.

After hearing, the trial court denied defendant's request, finding no need to deviate from its customary practice of questioning prospective jurors in open court. The trial court rejected the argument that jury selection done in a large group is tainted by an inherent herd instinct, in which potential jurors feel pressured to answer questions about their biases neutrally, rather than truthfully. In the trial court's view, "[a]ttitudes within the community are fairly fixed" on the subject of the death penalty and "if people are against it, they say so and if they aren't[,] they say so." The trial court also noted that potential jurors would have several days to complete a questionnaire in which

---

[7] Defendant suggests that the Legislature's amendment of section 223 after trial in his case, which gave counsel for each party a "limited right" to question prospective jurors directly, undermines our previous holdings. However, at the time we considered the equal protection challenges in those decisions, we were aware of the statute's amendment. (*People v. Robinson, supra,* 37 Cal.4th at pp. 612–613, fn. 10; *People v. Ramos, supra,* 34 Cal.4th at p. 512, fn. 5.) Defendant provides no basis, other than the mere fact of the amendment, that warrants reexamining the point.

they could privately express their feelings about the death penalty, and would be questioned based on their written responses. The trial court also indicated that, although it planned to conduct the group voir dire itself, it would allow the attorneys to ask questions directly in the event a prospective juror wanted to be questioned in chambers, outside the presence of other jurors.

Defendant contends the trial court violated his constitutional rights by refusing to conduct individual, sequestered voir dire.

Initially, we disagree with respondent's assertion that defendant has forfeited his claim because he did not challenge any juror for cause or exercise all of his peremptory challenges at trial. A defendant's failure to raise a for-cause challenge or to exhaust all peremptory challenges is relevant to the question whether he has preserved a claim on appeal that members of his jury were unacceptable to him. (*People v. Hoyos* (2007) 41 Cal.4th 872, 904 [63 Cal.Rptr.3d 1, 162 P.3d 528]; *People v. Hart, supra,* 20 Cal.4th at p. 589.) But a defendant who has made a timely objection to group voir dire and proposed that the trial court question prospective jurors individually has done all that is necessary. (*People v. Ramos, supra,* 34 Cal.4th at p. 513, fn. 6.) Thus, defendant's claim that the trial court erred in refusing his request is properly before us.

However, the claim fails on the merits. As we have repeatedly observed, there is no federal constitutional requirement that a trial court conduct individualized, sequestered voir dire in a capital case. (*People v. Lewis, supra,* 43 Cal.4th at p. 494; *People v. Ramos, supra,* 34 Cal.4th at pp. 511–513.) Nor did the trial court's denial of the motion for individual, sequestered voir dire violate any of defendant's rights under the state Constitution or other state law. (*People v. Lewis, supra,* 43 Cal.4th at p. 494; *People v. Waidla, supra,* 22 Cal.4th at pp. 713–714 [denial of motion for individual, sequestered voir dire reviewed for abuse of discretion].) Section 223 provides in relevant part that "[v]oir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors . . . ." Group voir dire may be "impracticable" when it has resulted in "actual, rather than merely potential, bias." (*People v. Vieira* (2005) 35 Cal.4th 264, 288 [25 Cal.Rptr.3d 337, 106 P.3d 990].) Here, however, defendant does not suggest that either the trial court's comments or the responses of other prospective jurors to the trial court's questioning influenced any prospective juror, and we find nothing in the record to indicate that group voir dire resulted in actual bias. (Cf. *People v. Lewis, supra,* at pp. 494–495 [evidence that 16 jurors changed their questionnaire answers after being "educated" during the voir dire process did not establish actual bias]; *People v. Vieira, supra,* at p. 289 [the possibility that prospective jurors may have answered questions to please the trial court shows at most potential, not actual, bias].)

Furthermore, the trial court acted well within its discretion in determining that group voir dire was "practicable" in this case. Though aware it had discretion to order individual, sequestered voir dire, the trial court, for the reasons it stated, reasonably rejected the argument that a "herd instinct" required a departure from its usual practice of questioning prospective jurors in large groups. Moreover, prospective jurors received lengthy questionnaires to complete on their own time, and the trial court, aided by counsel, conducted individualized voir dire when further inquiry into a questionnaire response was required or requested by any prospective juror who wished to discuss sensitive issues privately in chambers. The trial court's approach to voir dire was reasonable on this record. (Cf. *People v. Ramos, supra,* 34 Cal.4th at p. 514 [group voir dire was practicable where the trial court used juror questionnaires and allowed counsel privately to question certain prospective jurors].) Accordingly, we find that in denying defendant's motion for individualized voir dire of all prospective jurors, the trial court neither abused its discretion nor violated defendant's constitutional rights.

### b. *Adequacy of questioning on potential racial bias*

Defendant contends the trial court violated his right to an impartial jury because its voir dire was inadequate to discover racial bias in the prospective jurors.

The trial court gave prospective jurors at the first trial a questionnaire containing 98 questions, four of which concerned racial attitudes. One asked generally whether the prospective juror had "any racial or ethnic prejudices." Another asked whether the prospective juror had "any bias for or against the defendant based upon his race." A third explained that the defendant in the case "is African American" and asked the prospective juror whether "this fact [would] affect you as a juror at all." The fourth asked whether the prospective juror could be "impartial . . . in the case where an African American male is accused of committing crimes against a [C]aucasian female." The questions called for yes-or-no or multiple-choice answers, and further directed, "If 'Yes,' Please describe" or "Please explain," followed by three or four lines for additional comment.

Defendant complains generally that during voir dire the trial court conducted no inquiry into the racial views of any juror who served on the first jury. More specifically, he asserts that the written responses of three jurors contained contradictions or ambiguities that required followup questions on the issue of race. In support of his complaint, he cites the trial court's failure to ask followup questions of two jurors who indicated they had no "racial or ethnic prejudices," had no bias for or against defendant based on his race, and would not be affected by the fact that defendant is African-American, but

who also answered "No" when asked if they could be impartial jurors in a case where an African-American man is accused of committing crimes against a Caucasian female. Defendant also cites the trial court's failure to ask followup questions of another juror who, when asked whether she had any racial or ethnic prejudices, marked both "mild" and "none," and explained: "On occasion I find myself fearful around large numbers of [B]lacks, Hispanics—or even [W]hites—if it is an unsafe area." Given the cross-racial nature of the crimes, defendant argues, the trial court had to conduct searching voir dire of the sort designed to reveal subtle racial biases that might affect the prospective jurors' view of the evidence, and its failure to do so violated his constitutional right to a fair and impartial jury.

Defendant has forfeited this claim of error because his counsel failed to suggest followup questions the trial court could have asked the prospective jurors or otherwise complain about the adequacy of the trial court's voir dire. At the time the trial court denied counsel's motion for attorney-conducted voir dire, it expressly offered counsel an opportunity to suggest supplemental questions while voir dire was in progress, and stated it would permit counsel to ask questions directly when voir dire was being conducted in chambers. The record suggests defense counsel found no need to take the court up on its offer. Defendant, therefore, has not preserved for appeal his claim of inadequate voir dire. (*People v. Robinson, supra,* 37 Cal.4th at p. 620.)

But even were defendant's claim properly before us, it would fail on its merits. "[A]dequate inquiry into possible racial bias is . . . essential in a case in which an African-American defendant is charged with commission of a capital crime against a White victim." (*People v. Holt* (1997) 15 Cal.4th 619, 660 [63 Cal.Rptr.2d 782, 937 P.2d 213]; see also *Mu'min v. Virginia* (1991) 500 U.S. 415, 424 [114 L.Ed.2d 493, 111 S.Ct. 1899] [the 14th Amend. requires inquiry into racial prejudice in cases involving a Black defendant accused of violent crimes against a White victim].) However, because the trial court "is in the best position to assess the amount of voir dire required to ferret out latent prejudice, and to judge the responses" (*People v. Taylor* (1992) 5 Cal.App.4th 1299, 1314 [7 Cal.Rptr.2d 676]), it has wide discretion in conducting voir dire in areas of inquiry that might disclose juror bias and " 'in deciding what questions should be asked on *voir dire.*' " (*People v. Cleveland* (2004) 32 Cal.4th 704, 737 [11 Cal.Rptr.3d 236, 86 P.3d 302].) It abuses that discretion if its failure to ask questions renders the defendant's trial " 'fundamentally unfair' " or " ' "if the questioning is not reasonably sufficient to test the jury for bias or partiality." ' [Citation.]" (*Id.* at p. 737.)

Having reviewed the questionnaire, the written responses, and the voir dire of the jurors who served on the first trial, we conclude the trial court's inquiry into possible racial bias provides no basis for reversing. The questionnaire

included four questions that elicited from prospective jurors whether they held any racial biases and whether the circumstance defendant was an African-American man accused of committing crimes against a White woman would affect their impartiality. (Cf. *People v. Taylor, supra*, 5 Cal.App.4th at p. 1316 [in prosecution where the potential for racial bias against the defendant exists, the trial court's inquiry should elicit from prospective jurors their actual biases].) The record discloses several instances in which the trial court did inquire further into the subject of racial prejudice when warranted.[8] Moreover, as to all but three of the seated jurors, nothing in the questionnaire responses suggests that further inquiry into possible racial bias was necessary.

Regarding the three seated jurors whose questionnaire responses defendant now claims warranted further questioning regarding racial bias, it is unclear from the record why the trial court did not conduct additional questioning. (See *People v. Stewart, supra*, 33 Cal.4th at p. 448 [the juror's ambiguous answers on the questionnaire prompted a need for clarification on oral voir dire].)

But even were the trial court's questioning of these prospective jurors deficient as defendant claims, the voir dire, when viewed as a whole (*People v. Holt, supra*, 15 Cal.4th at p. 661), was not so inadequate as to render his trial fundamentally unfair. In *People v. Robinson, supra*, 37 Cal.4th at page 620, we found that the assertedly flawed voir dire examination of a prospective juror did not result in a fundamentally unfair trial, noting that defense counsel had an opportunity to suggest additional questions to be put to specific individuals but apparently saw no need to do so. We found, moreover, that defense counsel's failure to exhaust the entire allotment of peremptory challenges and the fact the first jury deadlocked on penalty were " ' "strong indication[s] 'that the jurors were fair, and that the defense itself so concluded.' " ' " (*Id.* at p. 619.) These factors dictate a similar result here.

We reject defendant's assertion, which he bases on *People v. Stewart, supra*, 33 Cal.4th 425, that the trial court relied too heavily on the questionnaires and asked too few questions during voir dire. In *Stewart*, we concluded the trial court committed reversible error in excusing five prospective jurors for cause based solely on their questionnaire responses without any followup questioning regarding their views on the death penalty. (*Id.* at pp. 441–455.) Here, the juror questionnaire gave the prospective jurors a clear opportunity to disclose views about racial bias that would warrant their excusal from the jury. (*People v. Avila, supra*, 38 Cal.4th at p. 531 [the trial court properly excused jurors for cause based solely on their questionnaire responses where

---

[8] For instance, the trial court probed the racial attitudes of a prospective juror who indicated in his questionnaire that he had "moderate" racial prejudices "with all races and ethnicities," and ultimately excused the prospective juror for cause.

the questionnaire was expansive and detailed, and the jurors' answers were unambiguous].) Furthermore, the trial court questioned every juror who served on defendant's first jury, observing their responses and demeanor and thereby gleaning "valuable information" about their states of mind. (*People v. Stewart, supra*, at p. 451.) Under these circumstances, the trial court's conclusions regarding the jurors' impartiality are entitled to deference. (*Id.* at pp. 450–451.)

Nor, contrary to defendant's suggestion, was the examination into possible racial bias in this case akin to the inadequate voir dire that led to reversal of the defendant's conviction in *People v. Wilborn* (1999) 70 Cal.App.4th 339 [82 Cal.Rptr.2d 583]. In *Wilborn*, the African-American defendant's trial strategy was to challenge the credibility of the White officers who stopped and then arrested him for a drug offense. (*Id.* at pp. 342–343.) Both orally and by written motion, defense counsel asked that the prospective jurors be questioned about racial bias, but the trial court refused to inquire into the subject, saying it " 'would rather not get into race.' " (*Id.* at p. 343.) The Court of Appeal reversed, concluding that under the circumstances of the case, the trial court had an obligation to make "*some* inquiry" into racial bias. (*Id.* at p. 348.) Because none was made, the appellate court concluded, the defendant was deprived of his right to an impartial jury. (*Ibid.*) Here, by contrast, the prospective jurors' responses to four questions likely to elicit racial biases, coupled with the trial court's observation of their demeanor during questioning, provided the trial court with an ample basis for ferreting out prospective jurors whose racial bias would interfere with their ability to be impartial. Furthermore, defense counsel did not ask for additional inquiry on the subject of racial bias and the record contains nothing to suggest the trial court would have refused such a request. Defendant's reliance on *Wilborn* is, therefore, misplaced.

For similar reasons, the New Jersey Supreme Court's decision in *State v. Williams* (1988) 113 N.J. 393 [550 A.2d 1172], which reversed an African-American defendant's conviction and death sentence, does not assist defendant. Noting that the trial court's voir dire consisted of only one question on racial bias, the *Williams* court observed, "When the defendant is a member of a cognizable minority group, a more searching *voir dire* should be conducted, *if requested.*" (*Id.*, 550 A.2d at p. 1190, second italics added; see also *People v. Bolden* (2002) 29 Cal.4th 515, 539 [127 Cal.Rptr.2d 802, 58 P.3d 931] [in a case involving an interracial killing, the trial court must question prospective jurors about racial prejudice "*on request*"].)

4. *Prosecutor's peremptory challenge against Prospective Juror T.B.*

Defendant claims the trial court erred in denying his motion under *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*), which asserted that the prosecutor impermissibly exercised a peremptory challenge against an African-American female prospective juror based on group bias.

■ The governing principles are well settled. "Under *Wheeler, supra,* 22 Cal.3d 258, '[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds"—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. [Citations.]' [Citation.] 'Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment. [Citations.]' " (*People v. Hawthorne* (2009) 46 Cal.4th 67, 77–78 [92 Cal.Rptr.3d 330, 205 P.3d 245].)

"*Batson* states the procedure and standard trial courts should use when handling motions challenging peremptory strikes." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1008 [47 Cal.Rptr.3d 467, 140 P.3d 775].) "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted (*Johnson*).)

After the trial court here concluded its voir dire of the prospective jurors, the parties proceeded to exercise their peremptory challenges. The prosecution exercised its fourth peremptory strike against Prospective Juror T.B., a young African-American woman. Defense counsel immediately asked to approach the bench, but the trial court denied the request. The peremptory challenges continued until the trial court called a recess. After the prospective jurors left the courtroom, defense counsel presented his objection to the prosecutor's strike against T.B., claiming that the prosecutor had excused the prospective juror in violation of the state and federal constitutional principles espoused in *Wheeler* and *Batson*. Counsel acknowledged that one other

African-American woman then was in the jury box, but asserted, "[W]e are deficient," and argued that the only reason the prosecutor excused T.B. was because of her race.

The trial court asked the prosecutor what she "ha[d] to say about that." The prosecutor inquired, "Is the court asking me to give reasons?" The trial court replied: "Tell you something, I know they have to make a showing. However, in this type of a case, I think it is important that the records be complete."

In response to the trial court's request for "some type of a basis" for excusing T.B., the prosecutor first explained: "She is 23 years old, which I have a rating as to youth and life experience, so it is a standard form I use for all the jurors. When I use the form, that's a negative being that age. I have an 18 to 29 range which is a negative, 23 years old, single, no children, basically no life experience . . . ." The prosecutor then explained that her "main reason" for excusing T.B. "is that [T.B.] said she was undecided on death." The prosecutor indicated she also felt T.B. had not been forthright about a crime for which her brother had been arrested in 1989. The trial court disagreed with that assessment, interjecting that T.B. disclosed on the juror questionnaire that her brother had been arrested for manslaughter and discussed the issue in chambers, saying she felt her brother had been treated fairly. The prosecutor added, finally, that T.B. did not vote.

The trial court then asked defense counsel whether he had anything further to say. Counsel responded, "Submit it." The trial court then denied the *Wheeler* motion without comment.

Initially, we reject defendant's argument that, because the trial court asked the prosecutor to state her race-neutral reasons for excusing T.B., we should proceed immediately to the third step of the *Batson* analysis—determining whether the record supports the prosecutor's race-neutral explanations— without first determining whether defendant established a prima facie case of intentional discrimination. Defendant relies on the high court's statement in *Hernandez v. New York* (1991) 500 U.S. 352 [114 L.Ed.2d 395, 111 S.Ct. 1859], that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." (*Id.* at p. 359.) However, a trial court's request that the prosecutor provide reasons for his or her exercise of a peremptory challenge is not an implicit finding the defendant has established a prima facie case, and does not moot the issue, in every instance. "In determining whether to infer a trial court's finding of a prima facie case under *Wheeler*, we look to the whole record, examining the court's remarks in context." (*People v. Hayes* (1990) 52 Cal.3d 577, 605, fn. 2 [276 Cal.Rptr.

874, 802 P.2d 376].) For example, in *People v. Welch* (1999) 20 Cal.4th 701, 746 [85 Cal.Rptr.2d 203, 976 P.2d 754], where the trial court had stated it did not believe the defendant had made a prima facie case under *Wheeler*, we declined to infer a contrary finding from the trial court's request that the prosecutor justify the peremptory challenges at issue "for purposes of completing the record on appeal." (See also *People v. Bittaker* (1989) 48 Cal.3d 1046, 1091–1092 [259 Cal.Rptr. 630, 774 P.2d 659].) By contrast, in *People v. Lewis, supra,* 43 Cal.4th 415, we determined that by asking the prosecutor for an explanation, the trial court had impliedly found a prima facie case because " 'nothing in the record suggest[ed]' " the trial court found otherwise. (*Id.* at p. 471, quoting *People v. Hayes, supra,* 52 Cal.3d at p. 605, fn. 2.)

Viewing the record as a whole and examining the trial court's remarks in context (*People v. Hayes, supra,* 52 Cal.3d at p. 605, fn. 2), we conclude that unlike the court in *Lewis,* the trial court in this case made no implicit finding that defendant established a prima facie case of intentional racial discrimination. To the contrary, the trial court's exchange with the prosecutor strongly suggests it found that defendant failed to establish a prima facie case under *Wheeler,* but wanted to "complet[e] the record on appeal." (*People v. Welch, supra,* 20 Cal.4th at p. 746; see also *People v. Howard* (2008) 42 Cal.4th 1000, 1018 [71 Cal.Rptr.3d 264, 175 P.3d 13] [trial court's comments implied prima facie case had not been made].) The record shows the trial court responded to the prosecutor's apparent surprise at being asked to comment on defendant's motion by explaining: "I know they have to make a showing. However, in this type of a case, I think it is important that the records be complete." Fairly read, the trial court's statement presupposes that the defense had *not* made a prima facie showing. Furthermore, although the trial court interrupted the prosecutor to contradict her assertion that T.B. had not been forthright about her brother's criminal history, it did not make factual findings regarding the credibility of any of the prosecutor's other race-neutral reasons. Instead, after the prosecutor finished stating her reasons, the trial court simply denied the *Wheeler/Batson* motion without comment. (*People v. Hawthorne, supra,* 46 Cal.4th at p. 78 [a finding of a prima facie showing would not be implied where the trial court announced it had found no prima facie case but asked the prosecutor to " 'protect the record' " by stating reasons, then repeated its ruling without further explanation].) Indeed, in his opening brief, defendant himself observes that "the judge did nothing but listen to the reasons given by the prosecutor and then immediately deny the [*Wheeler*]/*Batson* motion." Defendant makes that point to argue that the trial court's denial of his *Wheeler/Batson* motion is not entitled to deference because the trial court failed to engage in any meaningful evaluation of the prosecutor's justifications. But his observation equally supports the conclusion, which our review

of the record as a whole bears out, that because the trial court found no prima facie case of discrimination, it never intended to undertake a third-stage analysis.[9]

██ Having determined that the trial court impliedly found defendant failed to establish a prima facie case under *Wheeler/Batson,* we apply the standard the high court articulated in *Johnson, supra,* 545 U.S. 162, and undertake an independent review of the record to decide "the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of race." (*People v. Hawthorne, supra,* 46 Cal.4th at p. 79, italics omitted [reviewing court uses independent review to assess a finding of no prima facie case when it is unclear from the record whether the trial court used the strong-likelihood standard *Johnson* disapproved].) Under *Johnson,* a defendant satisfies the requirements of *Batson*'s first step "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson, supra,* at p. 170; see also *People v. Bonilla, supra,* 41 Cal.4th at p. 341 [defendant must show an inference of discrimination arising from the totality of the relevant facts].) The defendant "should make as complete a record of the circumstances as is feasible." (*Wheeler, supra,* 22 Cal.3d at p. 280.)

Here, defendant's showing was meager. In arguing the *Wheeler* motion, defense counsel merely pointed out that T.B. was an African-American woman and submitted the question on that basis alone, without referring to the juror's questionnaire or voir dire answers, responding to the prosecutor's stated reasons for the excusal, or pointing to any other evidence that would permit an inference of discrimination. That the prosecutor excused a single African-American prospective juror, without more, does not support the inference the excusal was based on race, especially given defendant's acknowledgment during the hearing that another African-American woman then was seated on the jury. (*People v. Cornwell* (2005) 37 Cal.4th 50, 69–70 [33 Cal.Rptr.3d 1, 117 P.3d 622]; see also *People v. Hamilton* (2009) 45 Cal.4th 863, 899 [89 Cal.Rptr.3d 286, 200 P.3d 898] [motion based only on excusal of a single African-American prospective juror failed to establish a prima facie case].) As we have observed, " 'the small absolute size of this sample

---

[9] We note that in asking the prosecutor to make a record of her race-neutral reasons for excusing the jurors in question, even though finding no prima facie case, the trial court followed "better practice." (*People v. Bonilla* (2007) 41 Cal.4th 313, 343, fn. 13 [60 Cal.Rptr.3d 209, 160 P.3d 84] [such information assists the trial court in evaluating the challenge and the reviewing court in assessing the ruling on appeal]; see also *People v. Howard, supra,* 42 Cal.4th at p. 1020.) Nonetheless, "[w]e again urge trial courts to make express findings on the existence of a prima facie case, so that reviewing courts need not determine this important question on the basis of implication." (*People v. Hayes, supra,* 52 Cal.3d at p. 605, fn. 2; see *People v. Fuentes* (1991) 54 Cal.3d 707, 716–717, fn. 5 [286 Cal.Rptr. 792, 818 P.2d 75].)

makes drawing an inference of discrimination from this fact alone impossible.' " (*People v. Bonilla, supra,* 41 Cal.4th at p. 343; see also *People v. Howard, supra,* 42 Cal.4th at p. 1018, fn. 10.)

Nor does our independent review of the record disclose any other basis for inferring the prosecutor excused T.B. because of her race. We have previously described the type of evidence that may be particularly useful regarding this inquiry. For instance, it is relevant whether the record shows that the prosecutor " ' "struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group." ' " (*People v. Kelly* (2007) 42 Cal.4th 763, 779 [68 Cal.Rptr.3d 531, 171 P.3d 548].) Also significant is whether the prosecutor failed to engage the prospective jurors " ' "in more than desultory voir dire, or indeed to ask them any questions at all." ' " (*Ibid.*) Although the defendant need not be a member of the excluded group in order to claim discriminatory excusals under *Wheeler,* it is relevant " ' "if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong." ' " (*Kelly,* at pp. 779–780.)

Both defendant and T.B. are African-American. And although neither the questionnaire nor the voir dire examination discloses the race or ethnicity of the seated jurors, we will assume for argument's sake that a majority of the jurors were White, like the victim. However, the record is otherwise devoid of any evidence supporting an inference of discrimination. First, although the record here does not disclose the racial or ethnic makeup of the juror pool, nothing suggests the prosecutor " ' "struck most or all" ' " (*People v. Kelly, supra,* 42 Cal.4th at p. 779) of the African-Americans from the venire. As noted above, defense counsel began his argument on the *Wheeler/Batson* motion by acknowledging that an African-American woman was then seated in the jury box, and there is nothing from which to infer that the prosecutor exercised a strike against her.

We note that the prosecutor asked T.B. no questions. Ordinarily, this circumstance is relevant to our inquiry. (*People v. Kelly, supra,* 42 Cal.4th at p. 779.) But, as previously noted in part II.B.2., at the time of defendant's trial in 1996, the trial court, not the parties, had primary responsibility for conducting voir dire. (§ 223, added by Prop. 115, § 7, eff. June 6, 1990.) Neither the prosecutor nor defense counsel asked questions of any prospective juror during voir dire in open court. Thus, the prosecutor's failure to ask T.B. any questions is not significant here. (*People v. Johnson* (2003) 30 Cal.4th 1302, 1328 [1 Cal.Rptr.3d 1, 71 P.3d 270].) Notably, before excusing T.B., the prosecutor had reviewed T.B.'s answers on a questionnaire containing 98 questions. (*People v. Bell* (2007) 40 Cal.4th 582, 598–599, fn. 5 [54 Cal.Rptr.3d 453, 151 P.3d 292] [noting the trial court's remark that when

every juror has answered an extensive questionnaire, " 'it can never be a perfunctory examination' "].) Moreover, the prosecutor observed the trial court's voir dire of T.B., which covered her friendship with a deputy marshal, her brother's experience in the criminal justice system, her ability to follow the law as instructed by the trial court, and her attitudes regarding the death penalty. Indeed, defendant complains that the trial court questioned T.B. *more closely* than it did a seated juror who likewise indicated on her questionnaire she was undecided about the death penalty.

Finally, the record discloses obvious race-neutral reasons for excusing T.B.: she was single and very young, and had not registered to vote. (See *People v. Arias* (1996) 13 Cal.4th 92, 139 [51 Cal.Rptr.2d 770, 913 P.2d 980] [the prospective juror's youthful age, marital status, and failure to register to vote were proper concerns for the prosecutor because they suggested the juror was uninvolved in society]; *People v. Sims* (1993) 5 Cal.4th 405, 429–430 [20 Cal.Rptr.2d 537, 853 P.2d 992] [the prosecutor stated proper race-neutral reasons for excusing the prospective juror on the ground the juror's youthfulness and lack of maturity affected her ability to accept responsibility in a death penalty case].) Based on our consideration of the relevant factors as well as the entire record of voir dire, we conclude the record fails to support an inference that the prosecutor excused T.B. on the basis of her race.

■ We reject defendant's assertion, based on our decision in *People v. Silva* (2001) 25 Cal.4th 345, 385 [106 Cal.Rptr.2d 93, 21 P.3d 769], that the trial court's failure to make " 'a sincere and reasoned attempt to evaluate' " the prosecution's explanation and clearly to express its findings requires reversal. *Silva* does not guide our inquiry here. We have found it proper for trial courts to request and consider a prosecutor's stated reasons for excusing a prospective juror even when they find no prima facie case of discrimination; indeed, we have encouraged this practice. (*People v. Bonilla, supra,* 41 Cal.4th at p. 343, fn. 13; *People v. Mayfield* (1997) 14 Cal.4th 668, 723–724 [60 Cal.Rptr.2d 1, 928 P.2d 485].) However, the trial court is not *required* to do this at the first stage of a *Wheeler/Batson* analysis, and the trial court's invitation here to the prosecutor to state her reasons for excusing T.B. did "not convert [this] first-stage *Wheeler/Batson* case into a third-stage case." (*People v. Howard, supra,* 42 Cal.4th at p. 1020; cf. *People v. Farnam* (2002) 28 Cal.4th 107, 138 [121 Cal.Rptr.2d 106, 47 P.3d 988] [where the reviewing court upholds a trial court's finding of no prima facie case of discrimination, it need not then review the trial court's evaluation of the prosecutor's proffered reasons for the strikes at issue].)

■ Finally, because the trial court's request did not "convert [this] first-stage *Wheeler/Batson* case into a third-stage case" (*People v. Howard, supra,* 42 Cal.4th at p. 1020), we also "decline defendant's invitation to

engage in comparative juror analysis" (*id.* at p. 1019). As we have explained, "[w]hatever use comparative juror analysis might have in a third-stage case for determining whether a prosecutor's proffered justifications for his [or her] strikes are pretextual, it has little or no use where the analysis does not hinge on the prosecution's actual proffered rationales . . . ." (*People v. Bonilla, supra,* 41 Cal.4th at p. 350.)

### C. Guilt phase issues

#### 1. Use of competency hearing evidence at the guilt phase

Before trial, defense counsel moved in limine for an order precluding the prosecutor from presenting at the guilt or penalty phase any evidence that had been developed for the section 1368 competency hearing. In particular, defense counsel sought to prevent the prosecutor from using as evidence in aggravation defendant's records from Harbor View Hospital, the inpatient drug rehabilitation facility where defendant had received treatment at age 16. The prosecutor had subpoenaed the Harbor View records after reading, in the report of a defense-retained competency expert, that defendant had been hospitalized there.

The trial court conducted two hearings on the motion. At the first, the trial court observed and the parties agreed that under *People v. Arcega* (1982) 32 Cal.3d 504 [186 Cal.Rptr. 94, 651 P.2d 338] (*Arcega*), defendant's statements to the court-appointed psychiatrists, Drs. Cerbone, Haroun, and Michel, and the fruits of any such statements, were inadmissible in the prosecutor's case-in-chief. However, at the second hearing, the trial court ruled that if during the guilt phase the defense called any expert who had testified at the competency hearing, then the prosecutor could use the witness's prior testimony for impeachment.

The defense called Dr. Cerbone as an expert witness at the guilt phase, and he testified that defendant suffered from substance-induced psychotic disorders, psychotic disorders not otherwise specified, and various forms of substance dependence. Dr. Cerbone arrived at those diagnoses after interviewing defendant and reviewing numerous materials, including police and investigative reports, psychiatric evaluations by four other mental health experts, hospital records, and summaries of interviews with friends, family, and members of defendant's household during his adolescence and young adulthood. Defense counsel handed Dr. Cerbone the Harbor View records for reference, and he used them extensively during his testimony. For instance, Dr. Cerbone testified he had learned from the records that defendant began using methamphetamine when he was between 12 and 14 years old, that the facility's treating psychiatrist had prescribed antipsychotic drugs, and that during defendant's

hospitalizations, he periodically exhibited lack of impulse control, excessive responses to provocation, and paranoid behavior. Dr. Cerbone also testified that, while defendant was at Harbor View, he was sometimes so imposing and threatening that he had to be physically restrained and sedated.

On cross-examination, the prosecutor's questioning drew from both the Harbor View records and the reports of the other mental experts who had evaluated defendant for competency, including Dr. Cerbone himself. For example, over defense objection, the prosecutor asked Dr. Cerbone why his present diagnosis differed from the one he had offered at the competency hearing, which was antisocial personality disorder. Quoting from the reports of Harbor View's treating psychiatrist, court-appointed competency expert Dr. Michel, and the defense-retained competency expert, Dr. MacSpeiden, the prosecutor asked Dr. Cerbone why no other expert had diagnosed defendant as psychotic. Finally, again over defense objection, the prosecutor asked Dr. Cerbone about two incidents, described in the Harbor View records, in which defendant had threatened staff. The prosecutor read from the records that defendant once told a staff member, "I will kill you, rip off your head, and stuff it down your neck," and that on another occasion defendant called a staff member a "bitch, cunt, whore." Dr. Cerbone responded that defendant was withdrawing from drugs at the time, which likely manifested itself in impulsive, threatening behavior.

On redirect examination, Dr. Cerbone described the new evidence and information that supported his current diagnosis, including psychiatric records from the Veterans Administration showing that defendant's father was paranoid schizophrenic. He again referred to the reports and testimony from the competency hearing when he explained why he disagreed with the diagnoses of the other experts who evaluated defendant for competency.

Defendant claims the trial court erred in permitting the prosecutor to cross-examine Dr. Cerbone with evidence obtained in preparation for and derived from the competency proceeding. Defendant complains specifically about the prosecutor's questions disclosing the diagnoses of the other competency experts and defendant's threats of violence against Harbor View staff.

■ When a doubt arises as to a defendant's competency to stand trial, the trial court must suspend proceedings and appoint a psychiatrist or psychologist to evaluate the defendant. (§§ 1368, 1369.) Where, as occurred here, the defendant is not seeking a finding of mental incompetence, the trial court must appoint two such evaluators, one of whom may be named by the defense and one by the prosecution. (§ 1369, subd. (a).)

A court-compelled competency examination implicates a defendant's Fifth Amendment rights. (*People v. Pokovich* (2006) 39 Cal.4th 1240, 1253 [48 Cal.Rptr.3d 158, 141 P.3d 267] (*Pokovich*); *Estelle v. Smith* (1981) 451 U.S. 454, 468–469 [68 L.Ed.2d 359, 101 S.Ct. 1866] (*Smith*).) Nonetheless, a defendant must submit to a competency examination by the court-appointed experts and may not refuse to do so by invoking his right against self-incrimination. (*Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465, 470 [122 Cal.Rptr. 61].) This requirement does not violate a defendant's self-incrimination rights because we have established a rule of immunity providing that " 'neither the statements of [the defendant] to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of [the defendant's] guilt . . . .' " (*Arcega, supra*, 32 Cal.3d at p. 522, quoting *Tarantino v. Superior Court, supra*, at p. 470.) By ensuring that a defendant will not be convicted by statements he made in the course of a court-compelled competency evaluation, this rule "promotes accuracy in the psychiatric evaluation" and "protects both an accused's privilege against self-incrimination and the public policy of not trying persons who are mentally incompetent." (*Arcega, supra*, at p. 522.)

No decision by the United States Supreme Court addresses how Fifth Amendment principles apply to the specific circumstances presented here. But, taken together, the high court's decisions in *Smith, supra*, 451 U.S. 454, *Buchanan v. Kentucky* (1987) 483 U.S. 402 [97 L.Ed.2d 336, 107 S.Ct. 2906] (*Buchanan*), and *Powell v. Texas* (1989) 492 U.S. 680 [106 L.Ed.2d 551, 109 S.Ct. 3146] (*Powell*) support the conclusion that the prosecutor's impeachment of the defense expert in this case did not violate defendant's self-incrimination rights.

 *Smith, supra*, 451 U.S. at page 468, holds that when a court compels a defendant to submit to a competency examination and the defendant does not place his mental state in issue at the guilt or penalty phase, the prosecution may not call the court-appointed psychiatrist to testify in its case in aggravation regarding the defendant's future dangerousness. The *Smith* court acknowledged the appellate decisions holding that the prosecution may obtain and use evidence from a compelled sanity examination when a defendant asserts an insanity defense and introduces psychiatric testimony. But it found those cases inapposite because, in *Smith*, the defendant had not put his competency or sanity in issue. (*Id.* at p. 465.)

In *Buchanan, supra*, 483 U.S. at pages 421–424, the defendant requested a psychiatric examination and raised a mental status defense at trial. Under these circumstances, the high court held, the Fifth Amendment does not preclude the prosecution from using the examination for rebuttal to the defense testimony. *Buchanan* reasoned that *Smith*'s holding "logically leads

to" the proposition that "if a defendant requests [a psychiatric] evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." (*Buchanan, supra,* at pp. 422–423.) A contrary conclusion, the high court explained, would mean that the prosecution "could not respond to" the defendant's mental status defense, which he based on psychological reports. (*Id.* at p. 423.)

In *Powell, supra,* 492 U.S. 680, the high court again addressed the Fifth Amendment implications of the prosecution's use of a court-compelled psychiatric evaluation at the penalty phase. In so doing, it appeared to approve the Fifth Circuit Court of Appeals decision in *Battie v. Estelle* (5th Cir. 1981) 655 F.2d 692. *Powell* explained that, in *Battie,* "the Court of Appeals suggested that if a defendant introduces psychiatric testimony to establish a mental-status defense, the government may be justified in also using such testimony to rebut the defense notwithstanding the defendant's assertion that the psychiatric examination was conducted in violation of his right against self-incrimination." (*Powell, supra,* at pp. 683–684.) *Powell* found that *Smith* and *Buchanan* provided "some support" for *Battie.* (*Powell, supra,* at p. 684.)

Here, defendant presented Dr. Cerbone's testimony in support of a mental status defense at the guilt phase. Under these circumstances, the Fifth Amendment did not preclude the prosecution from impeaching him with the evidence on which he based his opinion, which included the Harbor View Hospital records and the reports of the court-appointed competency experts.

The North Carolina Supreme Court reached a similar conclusion in *State v. Davis* (1998) 349 N.C. 1 [506 S.E.2d 455]. In that case, the trial court appointed Dr. Wolfe to evaluate the defendant for competency, and she tested the defendant while he was confined at Dorothea Dix Hospital. The defendant was eventually found competent. During trial, the defendant presented evidence in support of insanity and diminished capacity. The defense expert, Dr. McKee, testified that he had reviewed the records of the defendant's competency evaluation at Dorothea Dix, and during cross-examination, the prosecutor referred to those records. (*Id.,* 506 S.E.2d at pp. 463, 466–467.) On appeal, the defendant claimed the prosecutor's cross-examination violated his rights under the Fifth Amendment. The North Carolina Supreme Court disagreed. Relying on *Smith* and *Buchanan,* it concluded that because the defense expert had reviewed and referred to the defendant's competency evaluation records, the prosecution was not foreclosed from relying on the same materials to rebut the defendant's contentions. (*Davis,* at pp. 477–478.)

For two reasons, we reject defendant's argument that, notwithstanding *Smith* and its progeny, the prosecutor's cross-examination was improper

under *California* law. First, the rule of immunity we established for statements made to a court-appointed competency evaluator is founded on Fifth Amendment principles. (*Pokovich, supra*, 39 Cal.4th at p. 1253, fn. 5; *Arcega, supra*, 32 Cal.3d at pp. 522–523; see also *People v. Jablonski* (2006) 37 Cal.4th 774, 802–803 [38 Cal.Rptr.3d 98, 126 P.3d 938] [California's judicially declared immunity is coextensive with the 5th Amend.].) Second, none of our decisions supports defendant's argument. For instance, in *Pokovich, supra*, 39 Cal.4th at page 1254, we found that the trial court had erred in allowing the prosecutor to impeach the defendant's testimony at trial with statements he made during his mental competency evaluation. However, the defendant in that case, although testifying on his own behalf, did not present a mental status defense. Here, by contrast, defendant placed his mental state in issue and presented psychiatric evidence based largely on material from the competency examination. As previously explained, these circumstances warrant a different result.[10]

## 2. *Refusal to instruct on trespass and second degree murder*

Count 1 of the information charged that defendant "did willfully and unlawfully murder [Dixon] . . . in violation of Penal Code section 187(a)" and further alleged as special circumstances that defendant committed the murder while committing or attempting to commit rape, burglary, and oral copulation within the meaning of section 190.2, subdivision (a)(17). Counts 2, 3, and 4 charged, respectively, the substantive crimes of forcible rape, residential burglary, and forcible oral copulation. (§§ 261, subd. (a)(2), 459, 460, 288a, subd. (c).) At trial, the prosecution's theory of liability for count 1 was first degree felony murder based on the three felonies named in the special circumstance allegation.

Following the prosecution's case-in-chief, but before defendant presented his case, the trial court conferred with the parties on the jury instructions for the guilt phase. Defense counsel requested instructions on trespass as a lesser related offense of the charge of burglary in count 3, and second degree murder as a lesser included offense of first degree murder as charged in count 1. According to defense counsel, the instructions were necessary to the defense's twofold theory of the case: first, that no burglary occurred when defendant entered the victim's home because he lacked the intent to steal or commit any other felony at that time; and second, that the victim's extreme stress and fear upon first encountering defendant in her living room, not the

---

[10] Given our analysis, we need not determine whether, as defendant asserts, the Harbor View Hospital records, which derived from defendant's voluntary commitment to a drug rehabilitation facility well before the crimes and court-ordered competency evaluations, otherwise qualify for immunity under *Arcega* because the prosecution would not have learned of their existence absent the competency proceedings.

sexual assaults that occurred later in the back bedroom, caused the victim's fatal heart attack. Under these circumstances, defense counsel argued, the victim's death was a homicide caused by a life-threatening act that did not constitute a felony.

After hearing the prosecutor's opposition to instructing on both trespass and second degree murder, the trial court denied the request. It indicated it would revisit the issue if warranted by evidence adduced during the defense case or on rebuttal, but found that the facts of the case did not "in any way, shape or form" support giving the instructions the defense proposed.

After the close of evidence, trial counsel renewed the request for instruction on trespass and second degree murder. The trial court denied the request, repeating its earlier observation that "[t]his is a felony murder case."

### a. *Trespass*

Defendant contends the trial court erred in refusing to instruct on trespass because, without such a charge, defendant could not argue his theory to the jury. We find no error.

Trespass is a lesser related crime of burglary. (*People v. Birks* (1998) 19 Cal.4th 108, 118, fn. 8 [77 Cal.Rptr.2d 848, 960 P.2d 1073] (*Birks*).) In *Birks*, we held that instruction on a lesser related offense is proper only upon the mutual assent of the parties. (*Id.* at pp. 112–113, 136; see *id.* at p. 134 [allowing instruction on lesser related offenses over the prosecutor's objection interferes with prosecutorial charging discretion].) Here, because the prosecutor objected to instruction on the crime of trespass, the trial court correctly denied defendant's request.

We decline defendant's request that we reconsider our holding in *Birks*. As we recently explained in denying a similar request, refusing to grant a defendant's unilateral request for instructions on a lesser related offense does not violate any "constitutional due process right to present the 'theory of the defense case . . .' ." (*People v. Rundle* (2008) 43 Cal.4th 76, 148 [74 Cal.Rptr.3d 454, 180 P.3d 224].) Defendant errs in basing his contrary argument on the Ninth Circuit's decision in *Conde v. Henry* (9th Cir. 1999) 198 F.3d 734, as that case involved a trial court's failure to instruct on a lesser *included*, not a lesser *related*, offense. As we observed in *Birks*, the United States Supreme Court has "never suggested" that the federal Constitution requires instruction on offenses other than lesser included offenses of the charged crime when the evidence warrants. (*Birks, supra*, 19 Cal.4th at p. 124.) Defendant cites no decision or other authority issued since we decided *Birks* that warrants reconsideration of that decision. Thus, the trial court did not err in refusing to instruct on trespass.

b. *Second degree murder*

As to count 1, the trial court instructed the jury solely on the theory that a person "who unlawfully kills a human being during the commission or attempted commission of the felony crime of rape, and/or burglary, and/or forcible oral copulation is guilty of the crime of murder, in violation of section 187 of the Penal Code." (CALJIC No. 8.21.) Defendant contends the trial court reversibly erred by failing also to instruct on second degree implied-malice murder as a lesser included offense of first degree felony murder. We disagree.

Although it is settled that "[s]econd degree murder is a lesser included offense of first degree murder" (*People v. Blair, supra,* 36 Cal.4th at p. 745), we have yet to decide whether second degree murder is a lesser included offense of first degree murder where, as here, the prosecution proceeds only on a theory of first degree felony murder. (*People v. Romero* (2008) 44 Cal.4th 386, 402 [79 Cal.Rptr.3d 334, 187 P.3d 56]; *People v. Wilson* (2008) 43 Cal.4th 1, 16 [73 Cal.Rptr.3d 620, 178 P.3d 1113]; but see *People v. Anderson* (2006) 141 Cal.App.4th 430, 445 [45 Cal.Rptr.3d 910] [the trial court erred in failing to instruct on second degree murder when the prosecutor argued only felony murder liability but the information charged murder with malice aforethought].) We need not decide that question here because, as explained below, there was no substantial evidence of second degree implied-malice murder.

█ In criminal cases, even absent a request, a trial court must instruct on the general principles of law relevant to the issues the evidence raises. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) " 'That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]' " (*Ibid.*) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.]" (*Id.* at p. 162.)

█ "Second degree murder is the unlawful killing of a human being with malice, but without the additional elements . . . that would support a conviction of first degree murder. [Citations.]" (*People v. Hansen* (1994) 9 Cal.4th 300, 307 [36 Cal.Rptr.2d 609, 885 P.2d 1022].) Malice may be express or implied. (*People v. Lasko* (2000) 23 Cal.4th 101, 107 [96 Cal.Rptr.2d 441, 999 P.2d 666].) Malice will be implied "when the killing

results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. [Citations.]" (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1215 [264 Cal.Rptr. 841, 783 P.2d 200]; see also *People v. Knoller* (2007) 41 Cal.4th 139, 152 [59 Cal.Rptr.3d 157, 158 P.3d 731] [reaffirming *Dellinger*'s articulation of the standard].)

Defendant contends he was entitled to an instruction on second degree implied-malice murder because ample evidence supported the theory that the initial shock and fear the victim experienced when she first encountered him in her living room caused her fatal cardiac arrest. As defendant points out, Hayes testified that she and the victim were "scared to death" when defendant suddenly appeared. Furthermore, Dr. Wolf testified that the victim had preexisting heart disease and that diabetes, clogged arteries, and high blood pressure had compromised her lungs and heart. He also opined that the victim's fright at first seeing defendant played a "large part" in the cardiac arrest that caused her death.

Contrary to defendant's argument, no reasonable jury could have concluded from the above described evidence that defendant committed second degree implied-malice murder instead of first degree felony murder. Even were we to accept that the jury could have found defendant entered the victim's home with no felonious intent, there is no evidence from which it could have inferred that his conduct in the living room amounted to a dangerous act that he undertook knowingly and in conscious disregard of Dixon's life. (*People v. Dellinger, supra,* 49 Cal.3d at p. 1221.) The undisputed evidence showed that defendant, who was unarmed, stood silently in the victim's living room until the victim and her sister noticed him, then introduced himself, closed the front door, and sat down between the two women. Although defendant's unauthorized presence may have been startling and stressful, his conduct was not dangerous to human life. Defendant cites no decision, and we find none, holding that such evidence warranted instruction on second degree implied-malice murder. Because there was no substantial evidence supporting instruction on second degree murder, the trial court properly refused defendant's requested instruction.

Defendant errs in asserting that the trial court's ruling violated his federal constitutional due process and Sixth Amendment rights to "adequate instruction on the defense theory of the case." As earlier explained in connection with defendant's challenge to the trial court's refusal to instruct on trespass, defendant was free to argue, and did advance, to the jury his theory of the homicide, i.e., that the victim's stress and fright from his sudden appearance

in her living room set in motion the fatal cardiac arrest. The absence of an instruction on second degree murder did not result in a trial that was fundamentally unfair.

Nor, contrary to defendant's assertion, did the trial court's failure to instruct on second degree implied-malice murder implicate defendant's federal constitutional rights within the meaning of *Beck v. Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382]. Neither *Beck* nor any of the subsequent cases defendant cites requires instruction on a lesser included offense that substantial evidence does not support. (*People v. Wilson, supra,* 43 Cal.4th 1, 17.) Furthermore, and also contrary to defendant's argument, this is not a case in which the jury was impermissibly "forced into an all-or-nothing choice between capital murder and innocence." (See *Beck v. Alabama, supra,* at p. 629.) Here, the trial court gave the jury the noncapital third option of convicting defendant of first degree felony murder but finding not true the special circumstance allegations that made him death eligible. (*People v. Horning* (2004) 34 Cal.4th 871, 906 [22 Cal.Rptr.3d 305, 102 P.3d 228].)

### 3. *Instruction on first degree felony murder*

As previously noted, count 1 of the information charged defendant with "murder . . . in violation of Penal Code section 187(a)." Pointing to that portion of the information, defendant contends the trial court lacked jurisdiction to try him for first degree murder and that the felony murder instructions erroneously permitted the jury to convict him of an uncharged crime. More specifically, he asserts that the information's reference to section 187 left him charged with second degree malice murder, not first degree felony murder, which is set forth in a different part of the Penal Code—section 189.[11]

We have previously rejected arguments identical to those defendant raises here, concluding that "if the charging document charges the offense in the language of the statute defining murder (§ 187), the offense charged includes murder in the first degree and murder in the second degree." (*People v. Hawthorne, supra,* 46 Cal.4th at p. 89; see *People v. Wilson, supra,* 43 Cal.4th at p. 21.) Defendant's quotation of language in *Green v. United States* (1957) 355 U.S. 184 [2 L.Ed.2d 199, 78 S.Ct. 221] does not compel a different conclusion. There, the high court characterized second degree murder as an offense that is "distinct and different" from a "charge of felony murder." (*Id.* at p. 194, fn. 14.) But the court made that observation in connection with its holding that, under principles of double jeopardy, a

---

[11] At the time of defendant's trial in 1996, section 189 provided as relevant: "All murder . . . which is committed in the perpetration of, or attempt to perpetrate . . . rape, . . . burglary, . . . or any act punishable under Section . . . 288 . . . is murder of the first degree." (As amended Stats. 1993, ch. 611, § 4.5, p. 3507.)

defendant convicted of a lesser degree of a charged crime may not, upon reversal of the conviction, be retried for the greater crime. ■ It is axiomatic that an opinion does not stand for a proposition the court did not consider. (*People v. Martinez* (2000) 22 Cal.4th 106, 118 [91 Cal.Rptr.2d 687, 990 P.2d 563].) We reject defendant's claim of error by reaffirming that "[f]elony murder and premeditated murder are not distinct crimes, and need not be separately pleaded." (*People v. Nakahara* (2003) 30 Cal.4th 705, 712 [134 Cal.Rptr.2d 223, 68 P.3d 1190].)

### 4. *No unanimity instruction on theory of first degree murder*

The prosecutor's theory of the homicide was that defendant murdered the victim while committing rape, burglary, and/or forcible oral copulation, and the trial court instructed the jury accordingly. (See CALJIC No. 8.21.) Defendant contends that because the trial court did not instruct the jurors they must unanimously agree on which of the target offenses formed the basis of their verdict, and because the verdict form did not specify on which of the target offenses the verdict rested, the prosecution secured the murder conviction in violation of his rights under the federal and state Constitutions.

■ To convict a defendant of first degree murder, the jury must unanimously agree that the defendant is guilty of that offense beyond a reasonable doubt. But, as we have repeatedly explained, the jury need not unanimously agree on the theory underlying the first degree murder. (*People v. Hawthorne, supra,* 46 Cal.4th at p. 89; *People v. Carpenter* (1997) 15 Cal.4th 312, 394–395 [63 Cal.Rptr.2d 1, 935 P.2d 708].) We have also repeatedly rejected the argument, which defendant puts forth here, that a unanimity instruction is required under *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*), which held that the constitutional guarantees of due process and jury trial require that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (See *People v. Morgan* (2007) 42 Cal.4th 593, 617 [67 Cal.Rptr.3d 753, 170 P.3d 129] [nothing in *Apprendi* requires unanimous verdict on theory of first degree murder]; *People v. Nakahara, supra,* 30 Cal.4th at pp. 712–713 [same].)

In any event, even had the trial court erred in not giving a unanimity instruction, the error was harmless under any standard. The jury unanimously found defendant guilty of the substantive crimes of rape, forcible oral copulation, and burglary, and it unanimously found true the associated felony-murder special-circumstance allegations. Given these verdicts and findings, the jury necessarily reached unanimous agreement that defendant committed a first degree felony murder based upon rape, forcible oral copulation, and burglary. (Cf. *People v. Hawthorne, supra,* 46 Cal.4th at pp. 89–90; *People v. Carpenter, supra,* 15 Cal.4th at p. 395.)

In resisting this conclusion, defendant makes the related argument that, because the prosecution presented two distinct factual scenarios in support of its burglary theory, the trial court erred in failing to give a unanimity instruction regarding that offense. As defendant points out, the prosecution attempted to show that a burglary occurred when he first entered the victim's home and/or when he entered the back bedroom where he committed the sexual assaults, and the defense vigorously challenged the former theory with evidence and argument. As defendant also notes, in addition to the standard instruction on the elements of burglary, the trial court gave a special instruction further defining the crime, which stated: "The intent to rape need not be in the mind of the defendant at the time of the initial entry into the structure, if he subsequently forms the intent and enters a room within the structure." Defendant complains that because there was no unanimity instruction and no special findings on the verdict form, it is unclear whether the jurors unanimously agreed that he had an intent to steal or rape when he entered the home and/or an intent to rape and commit forcible oral copulation when he forced the two women into the back bedroom. Therefore, defendant continues, we cannot determine whether the jury unanimously found him guilty of either or both of the burglaries, or whether it properly found all facts essential to a first degree murder conviction based on the target offense of burglary. This failure to require juror unanimity on the elements of first degree felony murder, defendant contends, violated his constitutional rights to due process, a jury trial, and a fair and reliable penalty determination.

In *People v. Russo* (2001) 25 Cal.4th 1124, 1132–1133 [108 Cal.Rptr.2d 436, 25 P.3d 641] (*Russo*), we discussed the crime of burglary to illustrate "the difference between discrete crimes, which require a unanimity instruction, and theories of the case, which do not. Burglary requires an entry with a specified intent. [Citation.] If the evidence showed two different entries with burglarious intent, for example, one of a house on Elm Street on Tuesday and another of a house on Maple Street on Wednesday, the jury would have to unanimously find the defendant guilty of at least one of those acts. If, however, the evidence showed a single entry, but possible uncertainty as to the exact burglarious intent, that uncertainty would involve only the theory of the case and not require the unanimity instruction."

It is true that burglary may be committed not only by an entry into a home with the requisite felonious intent, but also by an entry (with the requisite felonious intent) from within the home into a bedroom inside the home. (*People v. Sparks* (2002) 28 Cal.4th 71, 86–88 [120 Cal.Rptr.2d 508, 47 P.3d 289] [construing § 459 to include within the definition of burglary an entry into the victim's bedroom within a home].) However, this is not to say the evidence in this case showed the commission of two discrete burglaries requiring a unanimity instruction. Rather, the evidence and argument on alternative "entries" bore on the issue of when defendant's felonious intent

arose—whether before entry into the home and/or before entry into the back bedroom—and thus concerned the theory of his liability for a singular burglary. "[T]he evidence merely present[ed] the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime." (*Russo, supra,* 25 Cal.4th at p. 1135.) Under these circumstances, juror unanimity was unnecessary. (*Ibid.*)

### 5. *Adequacy of special circumstance instruction*

In connection with the charge of murder in count 1, the information alleged that defendant committed the murder while committing rape, forcible oral copulation, and/or burglary. In instructing on the rape-murder special-circumstance allegation, the trial court informed the jury that to find that allegation true, "it must be proved: [¶] 1. The murder was committed while the defendant was engaged in the commission or attempted commission of a rape. [¶] The crime of rape is defined elsewhere in these instructions." (CALJIC No. 8.81.17 (1991 rev.) (5th ed. 1988).) The trial court gave the same instruction, with appropriate revisions, in connection with the forcible-oral-copulation-murder and burglary-murder special-circumstance allegations.

Defendant points out that when the trial court instructed the jury with CALJIC No. 8.81.17, it did not give the standard instruction's second paragraph. The omitted portion of the instruction would have informed the jury that to find the special circumstance allegation true, the prosecution must prove that "[t]he murder was committed in order to carry out or advance the commission of the [target crime] or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the [target crime] was merely incidental to the commission of the murder." (CALJIC No. 8.81.17.)

Defendant claims the trial court's failure to instruct the jury sua sponte with the second paragraph of CALJIC No. 8.81.17 constituted the omission of a necessary element of the special circumstance allegations, in violation of his constitutional right "to a jury determination of any fact on which the Legislature conditions an increase in [his] maximum punishment," within the meaning of *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]. Although defense counsel did not object to the truncated version of CALJIC No. 8.81.17 at issue here, he did request, though unsuccessfully, an instruction stating that to prove the special circumstance allegations, the prosecutor had the burden to show that "[t]he murder was committed in order to carry out or advance the commission of the crimes of burglary/rape/oral copulation . . . ." Defendant, therefore, has preserved his claim on appeal. (*People v. Valdez* (2004) 32 Cal.4th 73, 113 [8 Cal.Rptr.3d 271, 82 P.3d 296].)

■ However, the claim fails on its merits. As defendant acknowledges, we have previously rejected the assertion that the second paragraph of CALJIC No. 8.81.17 states an element of the special circumstance that must be presented to the jury for determination, regardless of whether the evidence warrants such an instruction. (*People v. Kimble* (1988) 44 Cal.3d 480, 501 [244 Cal.Rptr. 148, 749 P.2d 803]; *People v. Monterroso* (2004) 34 Cal.4th 743, 767 [22 Cal.Rptr.3d 1, 101 P.3d 956]; see also *People v. Valdez, supra*, 32 Cal.4th at pp. 113–114 [rejecting the claim that omission of the second paragraph allowed the jury to find the special circumstance allegation true based merely on a finding the murder took place during a robbery].) Defendant presents no persuasive grounds for reconsidering our prior holdings on the issue.

For the same reason, we reject defendant's related claim that we must reverse the special circumstance findings because the verdict forms did not require a finding that defendant committed the murder in order to carry out or advance the commission of the crime of robbery, rape, or oral copulation. As we observed in *People v. Navarette* (2003) 30 Cal.4th 458, 505 [133 Cal.Rptr.2d 89, 66 P.3d 1182], instructing with the second paragraph of CALJIC No. 8.81.17 is proper only "where the evidence suggests the defendant may have intended to murder his victim without having an independent intent to commit the felony that forms the basis of the special circumstance allegation." We there held that the trial court did not err in failing to read the instruction's second paragraph because the record lacked any significant evidence that anything other than burglary and/or robbery motivated the murders. (*Navarette*, at p. 505; see also *People v. Wilson, supra*, 43 Cal.4th at p. 18.) Likewise, because there was no evidence here reasonably suggesting that defendant intended to kill the victim without also having an independent intent to assault her sexually, the trial court did not err in omitting the second paragraph of CALJIC No. 8.81.17. Indeed, in this case, there was no evidence suggesting defendant harbored any intent to kill the victim, concurrently or otherwise. Rather, the evidence showed that defendant entered the victim's home unarmed. Within minutes of the entry, he pushed both the victim and her sister into the back bedroom, where he sexually assaulted the victim until ejaculating, and then ran from the house after pausing briefly on his way out to take money from an open purse belonging to the victim's sister. The evidence showed, moreover, that the victim's death was attributable to cardiac arrest resulting from fear, stress, and pain, and that a younger woman likely would have survived such an attack. On this record, there was no evidence from which the jury could have inferred that defendant entered the victim's home to murder her, and that the sexual assaults were merely incidental to the commission of that offense. The trial court thus did not err in omitting the second paragraph of CALJIC No. 8.81.17 when instructing the jury on the special circumstance allegations.

### 6. Instructions on consciousness of guilt

Prosecution witness Officer Gassmann described how he and his partner apprehended defendant after pulling him down from the victim's backyard fence shortly after the crimes. Officer Gassmann further testified that when he asked defendant what he was doing there, defendant first said he thought the house was vacant, and then stated that a friend of his named John Hall had just raped an old woman inside the house but had left before the police arrived. In connection with this evidence, the trial court gave CALJIC Nos. 2.03 and 2.52, which informed the jury that it could consider defendant's false statements and flight from the victim's home as evidence of his consciousness of guilt.[12]

Defendant claims the consciousness of guilt instructions the trial court gave were constitutionally defective because they were impermissibly argumentative (*People v. Wright* (1988) 45 Cal.3d 1126, 1135–1137 [248 Cal.Rptr. 600, 755 P.2d 1049]) and allowed the jury to draw irrational permissive inferences[13] (*People v. Castro* (1985) 38 Cal.3d 301, 313 [211 Cal.Rptr. 719, 696 P.2d 111]). As defendant acknowledges, we have repeatedly rejected identical challenges to the instructions at issue. (*People v. McWhorter* (2009) 47 Cal.4th 318, 377 [97 Cal.Rptr.3d 412, 212 P.3d 692]; *People v. Avila* (2009) 46 Cal.4th 680, 710 [94 Cal.Rptr.3d 699, 208 P.3d 634] [CALJIC No. 2.52]; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 221–222 [79 Cal.Rptr.3d 125, 186 P.3d 496] [CALJIC No. 2.03].) We decline his invitation to reconsider the issue.

---

[12] CALJIC No. 2.03 states: "If you find that before this trial the defendant made a false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

CALJIC No. 2.52 states: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

[13] Contrary to respondent's suggestion, defendant did not forfeit his claim regarding CALJIC No. 2.52 by failing to object to the instruction in the trial court. (§ 1259 [appellate court may review an instruction, even when no objection was made below, if defendant's substantial rights were affected]; *People v. Wallace* (2008) 44 Cal.4th 1032, 1074, fn. 7 [81 Cal.Rptr.3d 651, 189 P.3d 911]; *People v. Smithey* (1999) 20 Cal.4th 936, 982, fn. 12 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

### 7. Instruction on reasonable doubt

The trial court gave CALJIC No. 2.90, which defines the prosecution's burden of proof beyond a reasonable doubt.[14] Defendant presents a multi-pronged challenge to the instruction's constitutionality.[15] But the United States Supreme Court has approved CALJIC No. 2.90's language (*Victor v. Nebraska* (1994) 511 U.S. 1, 14–15 [127 L.Ed.2d 583, 114 S.Ct. 1239]), and appellate courts in California, including this court, have found no constitutional infirmity in the language of CALJIC No. 2.90 or its similarly worded successor, CALCRIM No. 222. (*People v. Whisenhunt, supra*, 44 Cal.4th at p. 221; *People v. Freeman* (1994) 8 Cal.4th 450, 501–505 [34 Cal.Rptr.2d 558, 882 P.2d 249]; *People v. Flores* (2007) 153 Cal.App.4th 1088, 1091–1094 [63 Cal.Rptr.3d 694]; *People v. Hernández Ríos* (2007) 151 Cal.App.4th 1154, 1155–1157 [60 Cal.Rptr.3d 591].) Defendant provides no persuasive reasons for revisiting the issue.

### 8. Instruction with CALJIC Nos. 2.02, 2.22, 2.27, and 2.51

Defendant contends that a series of instructions the trial court gave at the guilt phase undermined and diluted the constitutional requirement of proof beyond a reasonable doubt of every fact necessary to constitute the charged crime.

We have repeatedly concluded otherwise. CALJIC No. 2.02, regarding how to consider circumstantial evidence, does not compel the jury to render a verdict of guilty on a standard lower than reasonable doubt. (*People v. Nakahara, supra*, 30 Cal.4th at pp. 713–714.) CALJIC No. 2.22, regarding the weighing of conflicting testimony, did not replace the reasonable doubt standard of proof with a standard akin to preponderance of the evidence. (*People v. Nakahara, supra*, at pp. 714–715.) When given in combination

---

[14] The trial court instructed: "A defendant in a criminal action is presumed innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places on the People the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

[15] Defendant claims the giving of CALJIC No. 2.90 violated his right to due process because it (1) implied jurors had to articulate a reason for their doubt, (2) failed adequately to limit the scope of possible doubt, (3) failed to make clear that the defense had no obligation to present or refute evidence or to explain that a defense attempt to refute the prosecution's evidence did not shift the burden of proof, (4) failed to inform the jury that reasonable doubt could be based on a lack of evidence or conflict in the evidence, (5) failed to make clear that the presumption of innocence continues throughout the entire trial, and (6) lessened the prosecutor's burden of proof by suggesting that the prosecution would meet its burden.

with other instructions explaining the presumption of innocence and the prosecutor's burden to establish beyond a reasonable doubt each element of the charged crime, neither CALJIC No. 2.27, regarding the sufficiency of a single witness's testimony, nor CALJIC No. 2.51, regarding motive, impermissibly dilutes the requirement of proof beyond a reasonable doubt. (*People v. Kelly, supra,* 42 Cal.4th at p. 792; *People v. Whisenhunt, supra,* 44 Cal.4th at pp. 220–221; *People v. Cleveland, supra,* 32 Cal.4th at pp. 750–751.) The jury here received instructions on the presumption of innocence, the concept of reasonable doubt, and the prosecution's burden of proof. (See CALJIC No. 2.90.) We therefore reject defendant's claim that the challenged instructions violated his federal constitutional right to a jury verdict based on proof beyond a reasonable doubt, and we decline to reconsider our prior holdings regarding their constitutionality.

### 9. *Alleged comment on defendant's silence*

During closing statements, defense counsel argued, consistently with the defense theory of the homicide, that the evidence did not support a finding that defendant entered the victim's home with the specific intent to commit robbery, rape, or oral copulation, and that it was defendant's sudden, startling appearance in the living room that set into motion the fright and stress that caused the victim to suffer the fatal cardiac arrest. In rebuttal, the prosecutor asserted the defense theory was based on a "technicality." Focusing on defense counsel's acknowledgement that defendant "may have been up to no good" when he entered the house, the prosecutor remarked: "What is it, what's up to no good? What options do we have?" The prosecutor observed that "up to no good is stealing" and "may include the felony of rape . . . or . . . oral copulation," and then rhetorically asked: "What are those reasonable choices of up to no good? What is it that you can do at someone else's house at night that is up to no good that would not constitute theft or a felony? . . . Who took this stand and gave you a reasonable explanation as to another reason that the defendant may have been there?"

Defense counsel objected to the prosecutor's argument. The trial court overruled the objection. The prosecutor then continued: "I don't know. Did a neighbor or a friend or somebody say that there was a debt between these two people so [defendant] would have some reason that is up to no good of entering through the window, but that would still be a felony. So there is no reasonable explanation. Therefore, that argument has to fall."

The Fifth Amendment prohibits a prosecutor from commenting, directly or indirectly, on a defendant's decision not to testify on his own behalf. (*Griffin v. California* (1965) 380 U.S. 609, 613 [14 L.Ed.2d 106, 85 S.Ct. 1229]; *People v. Lewis* (2001) 25 Cal.4th 610, 670 [106 Cal.Rptr.2d

629, 22 P.3d 392] [directing the jury's attention to defendant's failure to testify runs the risk of inviting the jury to consider the defendant's silence as evidence of guilt].) Defendant contends that the prosecutor violated this constitutional prohibition when she asked, "Who took this stand and gave you a reasonable explanation [as to defendant's presence in the victim's home]?" In making this statement, defendant asserts, the prosecutor was clearly referring to defendant.

We disagree. The Fifth Amendment does not prohibit the prosecution from commenting on the state of the evidence presented at trial, or on the defense's failure to introduce material evidence or to call witnesses other than the defendant. (*People v. Cleveland, supra,* 32 Cal.4th at p. 764.) In context, the prosecutor's query was a proper comment on the evidence against defendant, not an implicit suggestion that defendant should have, or could have, provided a nonfelonious reason for his initial entry into the victim's home. (See *People v. Medina* (1995) 11 Cal.4th 694, 755–756 [47 Cal.Rptr.2d 165, 906 P.2d 2] [prosecutor's comment directed to the defendant's failure to provide an innocent explanation for the prosecution's evidence falls outside of *Griffin*'s purview].) The thrust of the prosecutor's argument is further confirmed by the question she posed immediately after the court overruled defense counsel's objection, which asked whether "a neighbor or a friend or somebody" had provided an explanation for defendant's entry into the victim's home. The prosecutor was entitled to comment on the defense's failure to call witnesses other than defendant. (*People v. Cleveland, supra,* at p. 764.) Contrary to defendant's argument, on this record, there is no reasonable likelihood the jury understood the prosecutor's remarks as an invitation to draw an improper inference of guilt from defendant's decision not to testify. (*People v. Medina, supra,* at p. 756.) Defendant's claim of *Griffin* error therefore fails.

### D. *Penalty phase issues*

#### 1. *Retrial following jury deadlock at first penalty trial*

Defendant contends that in permitting a second jury to decide penalty after the first jury deadlocked on that question, the trial court violated his rights under the Eighth Amendment and other federal and state constitutional provisions. Armed with a lengthy string citation to statutes of other jurisdictions that mandate a sentence of life without parole if the penalty jury deadlocks, defendant asserts that California is "out of step with an emerging national consensus against allowing retrial under these circumstances."

We have previously found no constitutional infirmity in a death verdict rendered by a second penalty phase jury at a retrial following the first

jury's deadlock on sentencing, notwithstanding that the second jury had not heard all of the guilt phase evidence. (*People v. Hawkins* (1995) 10 Cal.4th 920, 966–967 [42 Cal.Rptr.2d 636, 897 P.2d 574]; *People v. Gurule* (2002) 28 Cal.4th 557, 645 [123 Cal.Rptr.2d 345, 51 P.3d 224].) Although we have never addressed the precise Eighth Amendment challenge defendant raises, we have determined that "California's asserted status as being in the minority of jurisdictions worldwide that impose capital punishment" does not establish that our death penalty scheme per se violates the Eighth Amendment. (*People v. Thornton* (2007) 41 Cal.4th 391, 470 [61 Cal.Rptr.3d 461, 161 P.3d 3]; see *People v. Moon* (2005) 37 Cal.4th 1, 47–48 [32 Cal.Rptr.3d 894, 117 P.3d 591].) Likewise here, that California is among the "handful" of states that allows a penalty retrial following jury deadlock on penalty does not, in and of itself, establish a violation of the Eighth Amendment or "evolving standards of decency that mark the progress of a maturing society." (*Trop v. Dulles* (1958) 356 U.S. 86, 101 [2 L.Ed.2d 630, 78 S.Ct. 590].)

Arguing points more typically raised in a claim of double jeopardy, defendant further contends that compelling a capital defendant to endure the " 'embarrassment, expense and ordeal' " (*United States v. Scott* (1978) 437 U.S. 82, 95 [57 L.Ed.2d 65, 98 S.Ct. 2187]) of a second trial on the question of whether he should live or die is inconsistent with Eighth Amendment principles. But, as defendant concedes, in *Sattazahn v. Pennsylvania* (2003) 537 U.S. 101, 108–110 [154 L.Ed.2d 588, 123 S.Ct. 732], the high court held that the double jeopardy clause did not bar a penalty retrial after appellate reversal of the capital defendant's conviction, notwithstanding that in accordance with Pennsylvania law, the defendant had been sentenced to life without parole following juror deadlock at the penalty phase. Given that the double jeopardy clause permits retrial following juror deadlock under such circumstances, we fail to see how subjecting defendant to retrial of the penalty phase in this case could offend the constitutional proscription against cruel and unusual punishment.

## 2. *Selection of the second jury*

Defendant raises a number of challenges to the selection of the jury that decided penalty. As explained below, none has merit.

### a. *Death qualification voir dire*

Before selection of the penalty retrial jury, the prosecutor filed a motion requesting that prospective jurors be questioned about their ability to impose the death penalty on an actual killer who lacked an intent to kill in a

felony-murder special-circumstance case.[16] The prosecutor argued that such questioning was appropriate because a prospective juror who indicates, as an abstract, philosophical proposition, an inability to impose the death penalty in a felony-murder case absent an intent to kill, is biased and unable to follow the law, and thus should be dismissed for cause. Defense counsel submitted written opposition to the motion, arguing in relevant part that the proposed line of inquiry was a constitutionally impermissible attempt to seek prospective jurors' advisory opinions on the specific facts to be presented at trial.

After hearing the motion, the trial court agreed with defense counsel that, under applicable principles, it would be improper to present prospective jurors with the facts of the case and ask them if they would require an intent to kill in order to impose death. But the trial court also found it would be permissible to explain, in conjunction with the court's customary practice of emphasizing to prospective jurors that they must follow the law, that the felony-murder rule does not require an intent to kill, and to probe their attitudes on that point. The trial court ruled that it would present the issue in the questionnaire, with oral questioning as needed either in open court or in chambers.

After soliciting proposals from the parties on the wording of the question, the trial court added question No. 85 to the questionnaire, which began with this preface: "The law in California says that when a person is engaged in the commission of certain felony crimes such as burglary, rape, and oral copulation, and a death results, then he can be convicted of first degree murder. This is called a felony murder case. Also in such a felony murder case if the person is the actual killer, he may be subject to the death penalty even though he did not have the intent to kill a person. That is, the death can be unintentional or accidental." Following this preface were four questions: (1) "Do you have any views, attitudes, principles, or religious reasons about capital punishment that would prevent or substantially impair your ability to follow the law in regards to capital punishment as far as the felony murder rule is concerned?"; (2) "Would you be able to consider imposing the death penalty in a felony murder case in which a defendant did not intend to kill the victim?"; (3) "Would you automatically vote for the sentence of life without the possibility of parole in a felony murder case in which the defendant did not intend to kill the victim?"; and (4) "Would you automatically vote for the sentence of death in a felony murder case in which the defendant did not intend to kill the victim?"

---

[16] The prosecutor's motion appears to have been prompted by two members of the first jury who remarked after the mistrial was declared that they could not vote for the death penalty without a showing of intent to kill.

Defendant contends that these questions violated his constitutional rights to a fair and impartial jury and to a fundamentally fair trial. As explained below, we disagree.

The goal of voir dire in a capital case is to disclose whether prospective jurors hold views and attitudes that would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oath. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].) "Our decisions have explained that death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented. [Citation.] In deciding where to strike the balance in a particular case, trial courts have considerable discretion. [Citations.]" (*People v. Cash* (2002) 28 Cal.4th 703, 721–722 [122 Cal.Rptr.2d 545, 50 P.3d 332].)

In *People v. Pinholster* (1992) 1 Cal.4th 865, 916–918 [4 Cal.Rptr.2d 765, 824 P.2d 571] (*Pinholster*), we approved the prosecutor's inquiry into the prospective jurors' views on imposing the death penalty in a felony-murder case. As we explained, the prosecutor's voir dire questions, although related to facts of the particular case, led to an exchange that disclosed something about the jurors' attitudes in the abstract, which ultimately informed the crucial question whether the jurors could impose the death penalty in any burglary-murder case. (*Id.* at p. 918; cf. *People v. Ervin* (2000) 22 Cal.4th 48, 69–71 [91 Cal.Rptr.2d 623, 990 P.2d 506] [applying the reasoning of *Pinholster* to conclude voir dire questioning disclosing that the codefendant in a murder-for-hire case did not participate in the actual killing was not an improper inquiry into specific facts of case].)

Here, the questionnaire conveyed to prospective jurors a specific fact about the case: defendant did not intend to kill the victim. Contrary to defendant's assertion, however, nothing in the wording of the questions suggests they were being used for the prohibited purpose of "instructing, educating, cajoling, or prejudicing the jury" (*People v. Balderas* (1985) 41 Cal.3d 144, 182 [222 Cal.Rptr. 184, 711 P.2d 480]), or that they invited prospective jurors to prejudge the case. Rather, as in *Pinholster*, the four questions regarding the absence of intent to kill elicited from the prospective jurors information from which the trial court could determine their views in the abstract. A prospective juror who, regardless of the facts, could not vote for the death penalty in a felony-murder case absent a showing of intent to kill is properly excused for cause because holding such a view would

substantially impair the prospective juror's ability to perform a juror's duties. (*Pinholster, supra,* 1 Cal.4th at p. 918.) Here, the trial court struck the proper balance (*People v. Cash, supra,* 28 Cal.4th at p. 722) when it granted the prosecutor's request to explore prospective jurors' views on whether the absence of an intent to kill would substantially impair their ability to follow the law of felony murder.

Defendant further complains that the inquiry into prospective jurors' views on imposing the death penalty absent a showing of intent to kill allowed the prosecutor to eliminate all prospective jurors "who might have an open mind to the question whether it is appropriate to execute a person who did not intend to kill." In support of this complaint, defendant observes that the prosecutor exercised peremptory challenges against all three of the prospective jurors who gave ambiguous answers to the question "Would you be able to consider imposing the death penalty in a felony murder case in which a defendant did not intend to kill the victim?"

Defendant's argument is not well taken. As discussed, the trial court added the challenged questions to the questionnaire for the proper purpose of facilitating the disclosure of prospective jurors' attitudes in the abstract, which helped inform the trial court's determination whether they could impose the death penalty in any felony-murder case where there was no showing of intent to kill. Furthermore, defendant cites no authority suggesting that the prosecutor was not entitled to exercise a peremptory challenge against any prospective jurors she believed would refuse to vote for the death penalty absent evidence of an intent to kill. Indeed, we have held to the contrary. (*People v. Martinez, supra,* 47 Cal.4th at p. 460 [the prosecutor may excuse a juror whose opposition to the death penalty makes it less likely the juror will impose it].)

### b. *Adequacy of questioning on potential racial bias*

Defendant claims the trial court violated his right to an impartial jury by conducting an inadequate examination into the possible racial bias of the jurors selected to decide the penalty retrial. We disagree.

The prospective jurors for the penalty retrial, like their counterparts at the guilt phase, filled out a lengthy questionnaire that asked for yes-or-no or multiple-choice responses with space provided for additional comment. Like the questionnaire for the guilt phase, but with appropriate textual revisions, the questionnaire for the penalty phase included four questions that elicited from the prospective jurors their racial attitudes, inquiring, for example, whether they held any racial biases and, if so, whether those biases were "Strong," "Moderate," or "Mild." The questionnaire also asked prospective

jurors if the circumstance that defendant was an African-American man convicted of committing crimes against a Caucasian woman would affect their impartiality in determining penalty.[17]

The trial court and counsel for both sides reviewed the questionnaire answers. A group of 30 prospective jurors were then briefly questioned, in open court and, where appropriate, in chambers outside the presence of the other prospective jurors.

Defendant asserts that the trial court conducted inadequate voir dire of four jurors whose responses to the questionnaire required followup questioning on their racial views. He complains that although each of the four jurors indicated they had "Mild" racial or ethnic prejudices, the trial court asked no questions designed to elicit how these jurors' racial attitudes might affect their impartiality.

Defendant has forfeited this claim because his counsel failed to suggest any additional questions regarding racial bias or complain about the trial court's questioning. (*People v. Robinson, supra,* 37 Cal.4th at p. 620; cf. *Turner v. Murray* (1986) 476 U.S. 28, 37 [90 L.Ed.2d 27, 106 S.Ct. 1683] (*Turner*) [a defendant may not challenge on appeal the trial court's failure to question potential jurors on racial prejudice without having made a specific request for such an inquiry].) As during the first jury's selection, during selection of the second jury, the trial court communicated to the attorneys that it would consider their suggestions for followup questions, but defense counsel offered none.

In any event, defendant's claim fails on the merits. We have reviewed the juror questionnaire responses at issue, as well as the entire record of voir dire, and find no support for defendant's claim of inadequate questioning on

---

[17] The four questions eliciting the racial views of the prospective penalty retrial jurors were the following:

"52. Do you have any racial or ethnic prejudices?
 Strong ___ Moderate ___ Mild ___ None ___
 A. Please explain:
 B. How do you compensate for these attitudes?
"53. In this case the defendant is African American. Would this fact affect you as a juror at all? Yes ___ No ___
 If 'Yes,' please describe:
"54. In a case where an African-American male is convicted of committing crimes against a Caucasian female, can you be impartial in determining the appropriate penalty? Yes ___ No ___
 If 'Yes,' please describe:
"56. Do you have any bias for or against the defendant based upon his race?
 Yes ___ No ___
 If 'Yes,' please describe: . . ."

potential racial bias. Although four jurors indicated they had "mild" racial prejudices, their explanatory comments conveyed temperate, unremarkable attitudes that rendered further inquiry unnecessary. For instance, Juror No. 1 wrote, "I feel all of us have some ethnic prejudices and I am no different." Moreover, all four of the jurors responded "Yes" to the question whether they could be impartial in determining the appropriate penalty in a case involving an African-American man convicted of crimes committed against a Caucasian female. Contrary to defendant's suggestion, on this record, the trial court was not obligated to pose the same question orally during voir dire.

Our review of the record also discloses that the trial court was well aware of and fully satisfied its duty to ask prospective jurors relevant questions likely to reveal conscious or unconscious bias or prejudice. (*People v. Taylor, supra*, 5 Cal.App.4th at p. 1314.) Notably, the questionnaire responses of two prospective jurors prompted the trial court to probe deeper into the subject of racial bias during in-chambers voir dire, and the trial court ultimately excused those prospective jurors for cause. The court personally questioned every member of the penalty retrial jury, observing firsthand their responses and demeanor, and thereby gleaning "valuable information" about their states of mind. (*People v. Stewart, supra*, 33 Cal.4th at p. 451.) Therefore, the trial court's determination regarding the manner and scope of questioning is entitled to deference on appeal. (*Ibid.*) That defense counsel did not ask the court to pose additional questions to specific prospective jurors further suggests that the trial court's voir dire provided ample basis for ferreting out prospective jurors whose racial bias would interfere with their ability to be impartial. (*People v. Taylor, supra*, 5 Cal.App.4th at p. 1314.)

Defendant correctly observes that the United States Supreme Court has recognized the special risks that potential racial bias poses in the penalty phase of a capital trial. In reversing the death sentence of an African-American defendant in *Turner, supra*, 476 U.S. 28, the high court explained that the trial court's refusal to ask prospective jurors any questions about possible racial bias compelled reversal of the defendant's death sentence due to "a conjunction of three factors: the fact that the crime charged involved interracial violence, the broad discretion given the jury at the death-penalty hearing, and the special seriousness of the risk of improper sentencing in a capital case." (*Id.* at p. 37.) *Turner* does not assist defendant here, however. As previously discussed, the questionnaire amply explored the subject of racial bias, nothing in the jurors' responses to the questionnaire or at voir dire compelled further inquiry, and defense counsel did not ask the trial court to pose additional questions to specific prospective jurors. (*People v. Robinson, supra*, 37 Cal.4th at p. 640 [defendant's reliance on *Turner* is misplaced where the trial court probed racial bias issue in the questionnaire, and again orally at defense request].)

### c. *Prosecutor's exercise of peremptory challenges*

Defendant claims the trial court erred in denying his *Wheeler/Batson* motion asserting that the prosecutor impermissibly exercised peremptory challenges against two African-American prospective jurors and one Latina prospective juror on the basis of their race. We disagree.

As previously explained (*ante,* at pt. II.B.4.), a *Wheeler/Batson* motion involves a three-step inquiry. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson, supra,* 545 U.S. at p. 168, fn. omitted.)

During selection of the second jury, the prosecutor exercised her fourth peremptory challenge against a Latina prospective juror, M.E. When the prosecutor later used her eighth peremptory challenge to excuse Prospective Juror A.F., an African-American man, defense counsel asked for a conference in chambers, but the trial court denied the request. The prosecutor's next peremptory challenge was to Prospective Juror C.D., an African-American woman, and defense counsel again sought a hearing in chambers.

After the parties had exercised several more peremptory challenges, the trial court called a recess and, outside the jury's presence, heard defense counsel's motion for mistrial based on the prosecutor's excusal of the three prospective jurors. Defense counsel asserted that the prosecutor was "kicking off everybody of color" and confirmed with the trial court the names of the prospective jurors in question, but he advanced no further argument on the motion.

The trial court then invited the prosecutor to give her reasons for excusing A.F., prefacing the request with an explanation similar to the one it gave during selection of the first jury. The trial court stated: "Normally, I know in a *Wheeler* case there has to be some type of a showing that there is a pattern; however, in this type of case, the seriousness and the jaundiced eye that will be looking at this record[,] . . . I think it is important that you tell me why you did kick these people."

The prosecutor explained she had excused A.F. because, with 28 years as a probation officer, he came in with "precomposed [*sic*] ideas about the

system." The prosecutor felt A.F. would be "very open" to defense arguments on the root causes of defendant's behavior, given that A.F. had a "social worker therapy type job" and a social welfare degree, and that his questionnaire answers indicated he believed society should look at the causes of crime.

The trial court interjected, "You have said enough," and then asked about C.D. The prosecutor responded that she "mainly" was concerned about C.D.'s occupation as a psychiatric nurse and whether C.D. would "buy everything that the doctors say on behalf of the defendant." The prosecutor also noted that C.D. had "started off undecided on the death penalty."

The court again stated it had "heard enough" and indicated that the prosecutor should move on to M.E. The prosecutor explained that one reason for the excusal was that M.E. had served on a jury that failed to reach a verdict in a murder case. The prosecutor was also wary of M.E.'s attitudes on the death penalty, citing M.E.'s comment to the effect that she did not oppose the death penalty but had "a problem . . . with the consistency of the death penalty and who gets it."

After defense counsel declined the trial court's invitation to make further argument, the court stated, "At this point I see no systematic exclusion of these protected groups." When defense counsel again indicated he had nothing to add, the trial court reiterated, "I see no exclusion," and noted that the defense itself had "knocked off a person of color." When the prosecutor interjected that defense counsel's *Wheeler/Batson* objection during selection of the first jury involved only a single strike, the trial court dismissed her point, stating: "All I care about is what's before me in this case. I don't find any exercise of systematic exclusion at this time." The trial court then added, "There were reasons why you exercised your peremptories in this case, and in this court's opinion, it has nothing to do with having people of color off the jury."

Initially, we must again decide whether to infer from the trial court's invitation to the prosecutor to state her reasons for the challenged excusals that the trial court found defendant had satisfied his burden of establishing a prima facie case so as to proceed to a third-stage *Wheeler/Batson* analysis. "In determining whether to infer a trial court's finding of a prima facie case under *Wheeler*, we look to the whole record, examining the court's remarks in context." (*People v. Hayes, supra,* 52 Cal.3d at p. 605, fn. 2.)

For reasons similar to those previously discussed in connection with defendant's challenge to selection of the first jury (see, *ante,* pt. II.B.4.), we conclude the trial court found no prima facie case of intentional discrimination. The trial court's prefatory remarks to the prosecutor when it asked her to

make a record of reasons for her strikes presupposed that the defense had not made a prima facie case. Moreover, the trial court did not evaluate any of the prosecutor's stated reasons. Indeed, the trial court's repeated references to finding "no systematic exclusion" leaves little doubt that the trial court denied defendant's *Wheeler/Batson* motion on the ground that defendant had not established a prima facie case of discrimination. We have recognized that, although the term "systematic exclusion" is more appropriate to a claim of underrepresentation in the jury venire, courts sometimes use the term "to describe a discriminatory use of peremptory challenges." (*People v. Avila, supra,* 38 Cal.4th at p. 549, fn. 38.) For example, in *People v. Fuentes, supra,* 54 Cal.3d at page 716, the trial court based its finding of " 'no prima facie showing that there was a systematic exclusion' " on factors relevant to a first-stage *Wheeler/Batson* inquiry. (See also *People v. Bonilla, supra,* 41 Cal.4th at p. 342 [agreeing with the trial court that the defendant failed to make a prima facie showing where the trial court denied the *Wheeler/Batson* motion after finding " 'no systematic exclusion of Blacks' "].) Likewise, the trial court's pronouncements here that it saw no "systematic exclusion," viewed in context, are fairly understood as a finding that defendant failed to put forth sufficient evidence from which discrimination could be inferred.[18]

Nor is a different conclusion compelled by the trial court's remark to the prosecutor at the end of the hearing: "There were reasons why you exercised your peremptories . . . [that have] nothing to do with having people of color off the jury." We have encouraged trial courts to ask prosecutors to make a record of their reasons for any objected-to peremptory challenges even when no prima facie case has been established. (*People v. Bonilla, supra,* 41 Cal.4th at p. 343, fn. 13; see also *People v. Adanandus* (2007) 157 Cal.App.4th 496, 500–501 [69 Cal.Rptr.3d 25] [the trial court may invite the prosecutor to state race-neutral reasons before announcing its finding on whether the defendant has met his burden in the first step of the *Wheeler/Batson* test].) Viewed in context, the trial court's concluding comment is reasonably understood as an observation that the prosecutor's proffered reasons confirmed its finding that defendant failed to state a prima facie case of discrimination. (Cf. *People v. Hawthorne, supra,* 46 Cal.4th at p. 80 [after hearing the prosecutor's race-neutral reasons, the trial court repeated its earlier finding that no prima facie case had been shown].)

As we did in resolving defendant's challenge to the denial of the *Wheeler/Batson* motion he made during selection of the first jury, we have

---

[18] As we have noted, a trial court that draws an inference of discrimination, i.e., that finds a prima facie showing under *Wheeler/Batson,* will necessarily rely on a pattern of systematic exclusion of members of a cognizable group in the challenged excusals. (*People v. Bonilla, supra,* 41 Cal.4th at p. 343, fn. 12; *People v. Bell, supra,* 40 Cal.4th at p. 598, fn. 3.) It follows that, absent an express finding on the issue, a trial court's determination there has been no "systematic exclusion" is a finding that a prima facie showing has not been established.

independently reviewed the record and conclude that defendant failed to "produc[e] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson, supra*, 545 U.S. at p. 170.) Defendant's showing in support of his second *Wheeler/Batson* motion was meager. At the hearing, defense counsel relied solely on the fact the prosecutor had exercised three of her 10 peremptory challenges to excuse two African-American prospective jurors and one Hispanic prospective juror. Such evidence, without more, is insufficient to create an inference of discrimination, especially where, as here, the number of peremptory challenges at issue is so small. (*People v. Hawthorne, supra*, 46 Cal.4th at pp. 79–80 [no prima facie showing where the defendant's motion was based solely on the assertion that the prosecutor used three of 11 peremptories to excuse African-American prospective jurors]; *People v. Bonilla, supra*, 41 Cal.4th at p. 343 & fn. 12 [an inference of discrimination is difficult to discern from a small number of challenges].)

That defendant, A.F., and C.D. are African-American is some evidence permitting an inference of discriminatory excusal. (*People v. Kelly, supra*, 42 Cal.4th at p. 779.) Also relevant is whether the victim and a majority of the seated jurors are members of the same group (*ibid.*), and we will assume for argument's sake in this case that they are. However, the record lacks any other evidence that permits an inference of discriminatory excusal. The record does not disclose, for example, the number of African-American or Latino prospective jurors in the jury venire or on the jury panel at the time defendant raised his *Wheeler/Batson* objections, which is evidence from which we could conclude that the prosecutor " ' "struck most or all of the members of the identified group from the venire." ' " (*Kelly, supra*, at p. 779; see *People v. Hawthorne, supra*, 46 Cal.4th at pp. 79–80 [noting absence of similar evidence].) Nor do we find it significant that the prosecutor asked no questions of the prospective jurors during voir dire, as discussed more fully in part II.B.4. The record shows that although the prosecutor did not question the prospective jurors directly, she excused A.F., C.D., and M.E. after having reviewed their answers on the 99-question questionnaire and observed the trial court's questioning in open court.[19] Nor is there any suggestion that the

---

[19] Defendant suggests in his reply brief that the prosecutor failed to engage C.D. in "more than desultory voir dire" because she did not ask the trial court to explore C.D.'s views on evaluating testimony by mental health experts. Defendant points out that, in explaining her excusal of C.D., the prosecutor stated, "I don't know how much she knows or what opinions she really has about the mentally ill, whether she is going to buy everything that the doctors say on behalf of the defendant." We are not persuaded that the prosecutor's failure to seek additional questioning on this point supports an inference of discrimination. The record shows, and defendant concedes, that C.D.'s answers on her questionnaire indicated how she would view the testimony of mental health professionals at trial. Fairly read, the prosecutor's explanation for excusing C.D. was an expression of her belief that C.D. would be inclined to credit the defense experts' testimony despite her questionnaire responses.

prospective jurors excused by the prosecution were not adequately questioned. (*People v. Kelly, supra,* at p. 779.) To the contrary, the record shows that all three of the excused prospective jurors completed the 99-question questionnaire and that the trial court questioned each as extensively as the seated jurors. Indeed, defendant complains that A.F.'s views on the criminal justice system were subjected to *greater* scrutiny than were those of three White jurors who served on the penalty retrial jury.

Here, the record not only fails to support an inference of discrimination, but it also shows obvious race-neutral reasons for the excusal of all three of the prospective jurors in question. According to the questionnaires, A.F. was employed as a probation officer and C.D. worked as a nurse. Thus, both were engaged in professions the prosecutor reasonably could believe would tend to make them overly sympathetic to the defense. (*People v. Reynoso* (2003) 31 Cal.4th 903, 924–925 [3 Cal.Rptr.3d 769, 74 P.3d 852] [prosecutor may properly challenge potential jurors on the belief that their occupations do not render them the best type of juror to sit on the case]; *United States v. Thompson* (9th Cir. 1987) 827 F.2d 1254, 1260 [excusing jurors based on their profession is wholly within the prosecutor's prerogative].) As for M.E., her prior service on a deadlocked jury is an acceptable race-neutral ground for excusing her. (*People v. Farnam, supra,* 28 Cal.4th at p. 138; *People v. Turner* (1994) 8 Cal.4th 137, 170 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

Based on our independent review of the voir dire record, we conclude defendant failed to carry his burden of showing an inference of discrimination, and that the trial court, therefore, did not err in denying his *Wheeler/Batson* motion.[20]

### 3. *Admission of victim impact evidence*

Before the first penalty trial began, defense counsel filed a written motion to exclude or limit the prosecution's victim impact evidence. He argued in relevant part that the proposed testimony from numerous family members and other witnesses was cumulative, unduly prejudicial and inflammatory, in violation of federal constitutional principles and state evidentiary law. Counsel also pointed out that, under applicable decisions, family members could not give their opinions about the crime, the defendant, or the appropriate sentence.

The trial court denied the motion, ruling it would allow the witnesses to testify about the effects the victim's death had on them individually and on

---

[20] As with defendant's first *Wheeler/Batson* motion, because defendant failed to establish a prima facie case of intentional discrimination, we decline his request that we engage in comparative juror analysis. (See *People v. Howard, supra,* 42 Cal.4th at pp. 1019–1020; *People v. Bonilla, supra,* 41 Cal.4th at p. 350.)

society at large. The trial court admonished the prosecutor, however, that the testimony should be neither cumulative nor unduly emotional, and the trial court directed her to instruct her witnesses not to offer an opinion on the appropriate punishment.

By later stipulation of the parties, the trial court's ruling also governed the admission of victim impact evidence at the penalty retrial.[21] Accordingly, the prosecutor called eight witnesses to testify about the effects the victim's death had on them and on the community.

According to one family member, the victim's death "devastated four generations of a very close family." Betty Hayes testified that she constantly thinks about the sexual assaults, making her "scared all the time now," and that her sister's death "spoiled the rest of [her] life." Five other family members echoed similar feelings of grief and heartbreak, and some spoke of the "downward spiral" they experienced as a result of the victim's death. For instance, the victim's daughter, who suffered from multiple sclerosis, testified that the stress and shock of her mother's death had exacerbated her disease and caused her incontinence and loss of sight in one eye. A granddaughter indicated that in the two years since her grandmother's violent death, she suffered insomnia, withdrew from friends and activities she used to enjoy, and gained 50 pounds. A 13-year-old great-grandson described his great-grandmother as his "best friend," and testified that he sometimes wakes up crying in the middle of the night thinking about her.

The victim's daughter and two witnesses who were not members of the victim's family testified about the effects of her death on the community. For example, the director of the afterschool program of a nearby elementary school where the victim had volunteered once a week testified that some of the staff and children had known "Grandma Mae" for years, and that many of them cried when they learned she had been murdered. The witness also showed the jury a large card the children had decorated and presented to the victim on her 80th birthday shortly before the crimes.

Defendant contends the admission of this victim impact evidence was improper, unduly prejudicial, and exceeded constitutional limitations. We disagree.

The Eighth Amendment does not prohibit the admission of evidence showing how a defendant's crimes directly impacted the victim's family, friends, and the community as a whole, unless such evidence is "so unduly

---

[21] Before the penalty retrial, the parties agreed to incorporate into the record all previous motions and rulings. Defense counsel did not present any further challenge to the admission of the victim impact evidence.

prejudicial" that it results in a trial that is "fundamentally unfair." (*Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597] (*Payne*); see *People v. Marks* (2003) 31 Cal.4th 197, 235–236 [2 Cal.Rptr.3d 252, 72 P.3d 1222].) Likewise, under state law, victim impact evidence is admissible as a circumstance of the crime under section 190.3, factor (a), so long as it "is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180 [13 Cal.Rptr.3d 34, 89 P.3d 353]; see *People v. Zamudio* (2008) 43 Cal.4th 327, 364 [75 Cal.Rptr.3d 289, 181 P.3d 105].) Here, the victim impact evidence was neither unduly prejudicial nor so inflammatory that it invited the jury to make its penalty determination on a purely irrational basis. (*Payne, supra*, 501 U.S. at pp. 824–825; *People v. Pollock, supra*, 32 Cal.4th at p. 1180.) Although six family members testified, their testimony offered the personal perspectives of four different generations of the victim's close-knit family, and none was cumulative of another. Moreover, the victim impact testimony comprised fewer than 30 of the 400 pages of reporter's transcript reflecting the prosecution's case in aggravation. As for the substance of the victim impact testimony, our review of the record discloses that it "concerned the kinds of loss that loved ones commonly express in capital cases." (*People v. Lewis and Oliver, supra*, 39 Cal.4th at p. 1057.)

We also reject defendant's argument that admitting victim impact testimony from a witness who was neither a family member nor a close friend of the victim violated the Eighth Amendment. Our prior decisions recognize that, under *Payne*, constitutionally permissible victim impact evidence includes reference " 'to the status of the victim and the effect of [her] loss on friends, loved ones, and the community as a whole.' [Citation.]" (*People v. Marks, supra*, 31 Cal.4th at p. 236; see also *People v. Pollock, supra*, 32 Cal.4th at p. 1183.)

Defendant further challenges selected portions of family members' testimony on the ground it constituted impermissible opinion on the nature of the crime and defendant's character. For instance, defendant points out, family members described the victim as having been "tortured . . . to death," having experienced "the most painful agonizing death anybody could die from," and having "died in pain and terror and humiliation in a puddle of blood in the safety of her own home." Defendant notes, moreover, that the victim's daughter offered her opinion on defendant's character when she testified, "we are so completely, utterly, bitterly angry at that idiot."

As defendant correctly observes, the United States Supreme Court has made clear that "admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence

violates the Eighth Amendment." (*Payne, supra,* 501 U.S. at p. 830, fn. 2 [leaving intact the portion of *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] requiring exclusion of such evidence].) We conclude, however, that in context, the challenged testimony did not amount to personal opinion about the crimes or defendant, and its admission did not offend Eighth Amendment principles. Rather, the witnesses' comments about the murder's brutality and the reference to defendant illustrated how the crimes had affected them, which is proper and admissible victim impact evidence. (*People v. Pollock, supra,* 32 Cal.4th at p. 1182 [rejecting the defendant's challenge to testimony by victims' friend and a relative describing the murders as "brutal" and "a savage act"].) The record shows, for example, that the comment of the victim's granddaughter that the victim died "the most painful agonizing death anybody could die from" immediately preceded her remark that "there is no healing of that in me." When another family member was asked about the basis of her "downward spiral," she explained: "The fact that the last ten minutes of [the victim's] life are filled with terror and humiliation, I don't see any way around that. I don't see any peace for myself or for my family."

As for one family member's reference to defendant as "that idiot," this fleeting remark likewise was part of a proper expression of the harm that the murder had caused. The witness stated: "I think I probably speak for everybody in the grand circle. Family, close friends, we are so completely, utterly, bitterly angry at that idiot. We are very confused. We are dealing with a murder in the family and a dreadful murder in the family. We are dealing with social problems and ethical problems that we never dreamed of. We are still two years later dealing with legal problems involved. We are . . . heart broken." Contrary to defendant's assertions, the trial court admitted the challenged testimony for the proper purpose of reminding the jury that the victim was " 'an individual whose death represents a unique loss to society and in particular to [her] family.' [Citation.]" (*Payne, supra,* 501 U.S. at p. 825.)

In prior decisions, we have concluded there is no requirement that victim impact evidence be limited to the testimony of a single witness who was present at the scene either during or immediately after the crime, or that the testimony concern only those effects of the murder that were either known or reasonably apparent to the defendant at the time of the crimes. (*People v. Carrington* (2009) 47 Cal.4th 145, 164–165 [97 Cal.Rptr.3d 117, 211 P.3d 617]; *People v. Zamudio, supra,* 43 Cal.4th at p. 364.) Defendant presents no persuasive reason to revisit these decisions.

### 4. *Admission of photograph depicting victim's injuries*

As part of the case in aggravation, the prosecutor presented a color photograph of the victim's genital area, groin and thighs that Nurse Kinsey, the SART nurse, took at the outset of her examination in the hospital, approximately three hours after the sexual assaults occurred. The photograph showed blood on the victim's genital area and upper thighs.

Defendant contends the trial court erred by not excluding the photograph as inflammatory, prejudicial, cumulative, and irrelevant. He argues the trial court violated Evidence Code section 352 (section 352) and constitutional principles by failing to weigh the photograph's relevance against its prejudicial effects and by admitting it. We find no error.

The challenged photograph's admissibility was the subject of several motions and hearings. Before the start of the guilt phase, the trial court denied a defense motion under section 352 to exclude the photograph as inflammatory and irrelevant. The trial court did not disagree that the photograph was distasteful, but found it relevant to establishing a link between the evidence of blood found at the crime scene and the evidence that the victim was sexually assaulted.

The trial court revisited the photograph's admissibility before the penalty retrial, during a hearing on defense counsel's written exclusion motion. At the hearing, defense counsel argued that because the photograph was taken in the hospital more than three hours after the sexual assaults occurred, it did not accurately depict the injuries defendant inflicted and was not relevant under section 190.3, factor (a) as a circumstance of the crime. As defense counsel pointed out, the emergency room physician who saw the victim nearer in time to the crimes observed only a small amount of vaginal bleeding. Counsel posited that the reddish substance the photograph showed may have been the microbicidal Betadine or some other antiseptic agent.

The trial court again denied the motion to exclude the photograph, repeating its prior finding that the photograph was probative and material to the evidence showing "a lot of bleeding at the scene." In the course of its ruling, the trial court criticized the defense for offering no evidentiary support for its assertion that the stains on the victim's thighs were not blood, and cautioned counsel against arguing "in the dark" at trial.

The challenged photograph was once again the subject of discussion during a break in the prosecution's case in aggravation, when the prosecutor sought to substitute the original Polaroid photograph for the enlarged copy she had presented at the guilt phase. Without abandoning his earlier objection to the

evidence, defense counsel agreed that the smaller photograph was more accurate but asked that the trial court admit it during the testimony of the SART nurse. The trial court ruled it would admit the Polaroid photograph and allow the prosecutor to use the evidence as she pleased.

The prosecutor introduced the photograph during the testimony of the cardiology expert, Dr. Diggs, who answered in the affirmative when the prosecutor asked whether the photograph depicted the victim's condition before any hospital intervention. But Dr. Diggs also indicated he saw only "a small amount of blood" coming from the victim's vagina. By contrast, Nurse Kinsey testified that, as the photograph showed, the victim's external vaginal area extending down to her thighs was "grossly bloodied."

As a general rule, a trial court has broad discretion to determine the admissibility of a photograph challenged as unduly gruesome or inflammatory, and we will not disturb its determination on appeal unless the photograph's prejudicial effect clearly outweighs its probative value. (*People v. Martinez* (2003) 31 Cal.4th 673, 692 [3 Cal.Rptr.3d 648, 74 P.3d 748].) However, a trial court's discretion to exclude as unduly prejudicial evidence bearing on the circumstances of the crime is more limited (*People v. Salcido* (2008) 44 Cal.4th 93, 158 [79 Cal.Rptr.3d 54, 186 P.3d 437]; see *People v. Bonilla, supra*, 41 Cal.4th at p. 353), because at the penalty phase "the prosecution is entitled to place the capital offense and the offender in a morally bad light" (*People v. Box* (2000) 23 Cal.4th 1153, 1201 [99 Cal.Rptr.2d 69, 5 P.3d 130]; see *People v. Bonilla, supra*, at p. 353). In light of these principles, and having examined the disputed photograph, we find no abuse of discretion in the trial court's ruling admitting the photograph of the victim's injuries at the penalty phase retrial.

We disagree with defendant's contention that the challenged photograph had no probative value on the only issue before the penalty retrial jury, i.e., whether defendant should be sentenced to life without parole or to death. The photograph was relevant to show the circumstances of the crime (§ 190.3, factor (a); *People v. Sully* (1991) 53 Cal.3d 1195, 1241 [283 Cal.Rptr. 144, 812 P.2d 163]); as the trial court reasonably determined, it provided an evidentiary link between the bloodstained carpet underneath the victim at the scene and the sexual assaults defendant committed. Furthermore, the photograph aided Nurse Kinsey in her testimony to the jury about the extent of the victim's injuries from the sexual assaults. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1282 [96 Cal.Rptr.3d 512, 210 P.3d 1119] [the prosecution is not obliged to prove its case solely with live witnesses].) It is true that the prosecution's witnesses apparently disagreed over the amount of blood that appeared on and around the victim's vaginal area after her admission to the hospital. But that discrepancy went to the photograph's evidentiary weight, not its relevance. (*People v. Sully, supra*, at p. 1242.)

Nor, contrary to defendant's assertion, did the photograph's prejudicial effects outweigh its probative value. We have reviewed the photograph and conclude that, although disturbing, it is neither unduly gruesome nor inflammatory and "not of such a nature as to overcome the jury's rationality."[22] (*People v. Whisenhunt, supra,* 44 Cal.4th at p. 212.)

We also reject as unsupported by the record defendant's further assertion that the trial court failed to weigh the evidence's probative value against its prejudicial effects, as Evidence Code section 352 requires. "[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1169 [113 Cal.Rptr.2d 827, 34 P.3d 937].) Here, the parties had previously litigated the photograph's admissibility at the guilt phase of trial, with extensive argument on its prejudicial effects and probative value. In ruling that the evidence was admissible in the prosecutor's case-in-chief, the trial court determined that the photograph's distastefulness did not outweigh its relevance as a link between the crime scene evidence and the sexual assaults defendant committed. Although defense counsel advanced a different argument for excluding the photograph at the penalty phase, this time challenging its admission on relevance grounds, we can infer from the denial of that motion that the trial court remained of the view, expressed in its prior ruling, that the photograph's prejudicial effects did not substantially outweigh its probative value. Viewed as a whole, the record amply demonstrates that the trial court conducted the proper inquiry.[23]

■■■ Regarding defendant's claim that the photograph's admission violated his various rights under the federal and state Constitutions, as defendant properly acknowledges, " '[t]he "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights." [Citation.]' " (*People v. Lewis, supra,* 46 Cal.4th at p. 1284.)

---

[22] Defendant's citation to empirical research concerning the effects of graphic photographs on jury verdicts does not persuade us otherwise. Notably, defendant did not present this material to the trial court in his exclusion motion.

[23] Defendant insists the trial court's ruling was an expression of its displeasure with the defense rather than a determination of his primary argument that the timing of the photograph rendered it irrelevant. Defendant's reading of the record does not withstand scrutiny. The trial court did express dissatisfaction with the defense for failing to offer evidence to support its claim that the photograph was irrelevant because it did not accurately depict the injuries defendant inflicted. But nothing in the record suggests the trial court failed to consider defense counsel's challenge to the evidence's relevance.

### 5. *Admission of evidence of prior unadjudicated criminal activity*

The prosecution devoted part of its case in aggravation to defendant's past violent conduct and threats of violence. More specifically, the prosecutor presented testimony regarding three incidents: (1) Defendant's forcible sodomy and oral copulation of Jason L., (2) his threat to "fuck . . . up" a plainclothes officer, and (3) his assault on sheriff's deputies during transfer from one cell to another in the county jail. The prosecution introduced the evidence pursuant to section 190.3, factor (b) (factor (b)), which permits the jury at the penalty phase to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

Defendant asserts, as he did below, that the admission of evidence of these three prior unadjudicated incidents of violence or threats of violence as factors in aggravation under factor (b)—and an instruction expressly permitting the jury to consider such evidence—violated his federal and state constitutional rights.

### a. *Constitutionality of section 190.3, factor (b)*

Defendant presents a multipronged general attack on section 190.3, factor (b)'s constitutionality. He asserts first that admission of evidence under factor (b) does not withstand constitutional scrutiny because our interpretation of that provision treats "death differently, by lowering rather than heightening the reliability requirements in a manner that cannot be countenanced under the federal Constitution." In prior decisions, we have rejected the identical argument. (See, e.g., *People v. Harris* (2008) 43 Cal.4th 1269, 1315 [78 Cal.Rptr.3d 295, 185 P.3d 727] [nothing in the high court's decisions requires penalty phase procedures to be more rigorous than other criminal procedures].) We have also found that the use of unadjudicated offenses in capital proceedings, but not in noncapital matters, does not violate equal protection or due process principles. (*People v. Watson* (2008) 43 Cal.4th 652, 701 [76 Cal.Rptr.3d 208, 182 P.3d 543] [capital and noncapital defendants are not similarly situated and may be treated differently without offending equal protection or due process guarantees].) Likewise, we have found no requirement under the Sixth, Eighth, or Fourteenth Amendment that the jury unanimously agree on the existence of unadjudicated criminal conduct beyond a reasonable doubt. (*People v. Rogers* (2006) 39 Cal.4th 826, 893 [48 Cal.Rptr.3d 1, 141 P.3d 135].) And we have previously rejected defendant's assertion here that the high court's recent decisions on the Sixth Amendment's jury trial right call for a different result on that issue. (See, e.g., *People v. Hoyos, supra,* 41 Cal.4th at p. 926 [juror unanimity on the existence

of aggravating factors is not required under the reasoning of *Apprendi*, 530 U.S. 466, and its progeny]; *People v. Stevens* (2007) 41 Cal.4th 182, 212 [59 Cal.Rptr.3d 196, 158 P.3d 763] [*Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856] does not compel a different conclusion].)

Defendant further claims that use of the same jury at both the guilt and penalty phases of the trial deprives the accused of an impartial and unbiased jury, and undermines the reliability of any determination of guilt, because "a jury which already has unanimously found a defendant guilty of capital murder cannot be impartial in considering whether similar but unrelated violent crimes have been proved beyond a reasonable doubt." Defendant has no standing to complain that the same jury decides both guilt and penalty because the jury that decided his penalty was not the same jury that decided his guilt. (16 C.J.S. (2005) Constitutional Law, § 111, p. 143 et seq. [to raise a constitutional question, the party complaining must show that his or her rights are injuriously affected].) In any event, we have repeatedly concluded there is no constitutional infirmity in using the same jury that decided guilt to weigh evidence of unadjudicated crimes. (*People v. Rogers, supra*, 39 Cal.4th at p. 894; *People v. Young* (2005) 34 Cal.4th 1149, 1207–1208 [24 Cal.Rptr.3d 112, 105 P.3d 487].) Contrary to defendant's assertion, we have also rejected the argument that use of a single jury prevents defense counsel from adequately questioning prospective jurors as to their potential biases with respect to the alleged unadjudicated crimes without forfeiting a defendant's right to keep such evidence from the jurors during the guilt phase. As in *People v. Harris, supra*, 43 Cal.4th 1269, the unadjudicated conduct at issue here was no more inflammatory than the charged offenses. (*Id.* at p. 1316.) Moreover, because the jury that decided penalty was selected solely for that phase of trial, defense counsel here did not face an assertedly impermissible choice between adequate examination into juror bias and the presentation of prejudicial evidence of crimes other than those charged in the case.

b. *Evidence of sexual assaults against Jason L.*

Over trial counsel's renewed objection, the prosecutor called 20-year-old Jason L. to testify about being sexually assaulted by defendant as a youth. Jason testified that while home one day after school when he was eight years old and defendant was 12 or 13, defendant threatened him with a steak knife, forced him to orally copulate defendant, and then sodomized him.

 As defendant acknowledges, we have long held that although the fact of a juvenile adjudication is inadmissible as a factor in aggravation, juvenile criminal activity involving force or violence is admissible as aggravating evidence under factor (b). (*People v. Lewis* (2001) 26 Cal.4th 334, 378

[110 Cal.Rptr.2d 272, 28 P.3d 34]; *People v. Lucky* (1988) 45 Cal.3d 259, 295 [247 Cal.Rptr. 1, 753 P.2d 1052].) Defendant urges us to reconsider this holding, arguing that because a juvenile court adjudication affords more procedural safeguards than does the factor (b) admission process—which demands neither juror unanimity nor instruction on the elements of the unadjudicated crime—it is "inherently illogic[al]" to allow the prosecutor to present the underlying facts of criminal activity but not the fact of the activity's adjudication.

Contrary to defendant's assertion, there is no illogic in the rule prohibiting admission of the fact of a juvenile adjudication while permitting evidence of violent juvenile criminal activity. Juvenile adjudications are inadmissible as evidence in aggravation, not because of their evidentiary weight or reliability, but because they are not "prior felony convictions" within the meaning of section 190.3, factor (c). *(People v. Burton* (1989) 48 Cal.3d 843, 861–862 [258 Cal.Rptr. 184, 771 P.2d 1270]; see also Welf. & Inst. Code, § 203 [order adjudging minor a ward of the court "shall not be deemed a conviction of a crime for any purpose"].) Factor (b), on the other hand, involves evidence of violent conduct other than the capital crimes, regardless of when the misconduct occurred or whether it led to a criminal conviction. *(People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1052.) Such evidence is permitted because it " 'enable[s] the jury to make an individualized assessment of the character and history of the defendant to determine the nature of the punishment to be imposed.' [Citation.]" *(People v. Davis* (1995) 10 Cal.4th 463, 544 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Thus, although the fact of the juvenile adjudication is inadmissible, the conduct underlying the adjudication is relevant to the jury's penalty determination and admissible as violent criminal activity under factor (b). *(People v. Lucky, supra,* 45 Cal.3d at pp. 295–296, fn. 24 ["It is not the adjudication, but the conduct itself, which is relevant."].) Defendant's claim of an internal inconsistency fails.[24]

Defendant argues that the high court's decision in *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1, 125 S.Ct. 1183], precludes admission of his juvenile criminal activity. As we recently explained, however, *Roper* does not compel exclusion of such evidence. *(People v. Bramit* (2009) 46 Cal.4th 1221, 1239 [96 Cal.Rptr.3d 574, 210 P.3d 1171] [*Roper's* holding that the 8th Amend. prohibits the execution of a condemned prisoner younger than 18

---

[24] We also reject defendant's contention, raised for the first time in his reply brief, that he was unduly prejudiced by the fact the allegations of his sexual crimes against Jason L. were being determined by the penalty phase jury 10 years after the incident allegedly occurred. *(People v. Lewis, supra,* 26 Cal.4th at p. 379 [defendant was not deprived of the right to a fair trial or due process by the penalty jury's determination of his mental state during the commission of a crime committed as a juvenile 16 years earlier].)

years old at the time of the capital offense says nothing about the propriety of permitting a capital sentencing jury to consider the defendant's violent conduct as a juvenile].)

Defendant asserts finally that in instructing the jury regarding the Jason L. incident, the trial court erred by not setting forth the elements of the crimes of forcible sodomy and oral copulation. We have repeatedly held, however, that absent a request, a trial court has no duty to instruct on the elements of unadjudicated crimes admitted under factor (b). (*People v. Guerra* (2006) 37 Cal.4th 1067, 1147 [40 Cal.Rptr.3d 118, 129 P.3d 321]; *People v. Anderson* (2001) 25 Cal.4th 543, 588 [106 Cal.Rptr.2d 575, 22 P.3d 347] [rule recognizes the defense concern that such instructions may lead the jury to place undue emphasis on unadjudicated crimes, rather than on the question of penalty].) We also have rejected defendant's further argument that recent high court decisions on the Sixth Amendment right to jury trial call that rule into question. *Apprendi, supra*, 530 U.S. at page 490, holds that a fact, other than a prior conviction, "that increases the penalty for a crime beyond the prescribed statutory maximum" must be submitted to the jury and proved beyond a reasonable doubt. As we have explained, however, because death is no more than the statutory maximum once a special circumstance allegation is found true, the penalty determination in a capital case falls outside of *Apprendi*'s rule. (*People v. Anderson, supra*, 25 Cal.4th at p. 589, fn. 14.)

### c. *Evidence of incident in county jail*

In the notice of evidence in aggravation, the prosecution indicated it intended to introduce under factor (b) eight incidents involving defendant's use or threats of violence, including "[a]ll evidence, facts underlying, statements of witnesses and the defendant related to the defendant's use or attempted use of force or violence or the express or implied threat to use force or violence on Sheriff's Deputies on March 3, 1996." By written motion, defendant objected to all of the proposed "other crimes" evidence on various grounds and sought a hearing on its admissibility.

The trial court conducted the requested hearing in conjunction with the parties' numerous other pretrial motions. At the outset of that hearing, the trial court heard extensive argument on a defense motion, pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305], seeking the personnel files of the six named sheriff's deputies who were involved in the March 3 incident, and granted the motion as to the files of one officer. Later in the hearing, the trial court ruled it would allow the

prosecution to present the evidence of the county jail incident in its case in aggravation, stating simply, "We already litigated that."[25]

At the penalty retrial, and over trial counsel's renewed objection, the prosecution called three sheriff's deputies to testify about the March 3, 1996, incident at the San Diego County jail while defendant was awaiting trial in the case. According to the officers' testimony, on that date, six sheriff's deputies wielding pepper spray and a shock-emitting shield "extracted" defendant from his jail cell after he refused directions to relocate to a more secure unit. When defendant finally emerged from his cell and deputies moved closer to handcuff him, he started cursing, then charged at them with his head down and fists raised. Defendant ran down the hallway for about 500 feet before he was subdued. As a result of the incident, defendant was housed in the cell used for disciplining inmates and charged with a rules violation.

Noting that evidence of violent conduct or threats of violence admitted under factor (b) must amount to an actual crime (*People v. Phillips, supra*, 41 Cal.3d at p. 72), defendant contends the trial court erred in admitting the evidence of the county jail incident because the prosecutor made no effort to tie those events to a violation of any particular penal statute. He claims, furthermore, that the trial court compounded its evidentiary error by giving CALJIC No. 8.87, which told the jury how to consider evidence of unadjudicated criminal activity in making its penalty determination but failed to identify, or instruct on, the elements of the crime defendant allegedly had committed.[26] Defendant argues that the failure to specify and instruct on the elements of the particular crime at issue in that incident rendered meaningless the rule that the jury may consider evidence of unadjudicated crimes as a factor in aggravation only when such criminal activity is proved beyond a reasonable doubt.

**(34)** Defendant is correct that the penalty jury could not properly consider "other crimes" evidence as an aggravating factor unless it was satisfied beyond a reasonable doubt he committed the criminal activity, and the trial court had a sua sponte duty to so instruct. (*People v. Anderson, supra*, 25 Cal.4th at p. 584; *People v. Robertson* (1982) 33 Cal.3d 21, 53–56 [188

---

[25] The trial court did not elaborate on its ruling admitting evidence of the county jail incident. But implicit in its ruling on the *Pitchess* motion was a determination that the prosecutor had set forth substantial evidence the incident constituted an actual crime, thus warranting a jury determination of whether that criminal activity had been proven beyond a reasonable doubt and could be considered as an aggravating factor. (See *People v. Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].)

[26] The court instructed: "Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts or activity which involved the express or implied use of force or violence, or the threat of force or violence: . . . 3) defendant's incident involving sheriff's deputies on March 3, 1996 in the County Jail . . . ."

Cal.Rptr. 77, 655 P.2d 279].) But defendant points to no case imposing a duty on the prosecutor or the trial court to identify for the jury the actual offense defined by the criminal activity admitted as factor (b) evidence. Indeed, to the contrary, we have held that absent a request, the trial court has no duty to specify the names or elements of the unadjudicated crimes when instructing the jury on factor (b) evidence. (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 591–592 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; *People v. Hardy* (1992) 2 Cal.4th 86, 205–206 [5 Cal.Rptr.2d 796, 825 P.2d 781].) The premise of this rule is that, for tactical reasons, most defendants prefer not to risk having the jury place undue emphasis on the prior violent crimes. (*People v. Tuilaepa, supra*, at p. 592.)

Contrary to defendant's suggestion, the failure to identify an actual crime does not undermine the reasonable doubt standard for considering an unadjudicated crime as an aggravating factor. As we have explained, that standard is a "foundational requirement"—which California law, not the Constitution, imposes—to ensure that "before a sentencing juror weighs the *culpable nature* of such other violent criminal conduct on the issue of penalty, he or she must be highly certain that the defendant committed it." (*People v. Anderson, supra*, 25 Cal.4th at p. 589.) Here, the trial court properly determined the legal question whether the prosecution's proposed evidence in aggravation was an actual crime involving violence or the threat of violence[27] (*People v. Loker* (2008) 44 Cal.4th 691, 745 [80 Cal.Rptr.3d 630, 188 P.3d 580]), and informed the jurors they had to be convinced beyond a reasonable doubt that defendant committed the alleged unadjudicated criminal act before they could consider such evidence as a factor in aggravation. Therefore, the failure to identify or define the specific crime constituting the criminal activity did not render meaningless the reasonable doubt requirement or otherwise skew the jury's normative determination of the appropriate penalty. (*People v. Anderson, supra*, at p. 589.)

### d. *Evidence of threat to plainclothes officer*

Over defense objection, the prosecution presented evidence of an encounter between defendant and Officer John Cherski. On August 11, 1994, less than one year before committing the capital crimes, defendant was in downtown San Diego cleaning up the sidewalk with his coworkers from an urban renewal project. Officer Cherski was in the vicinity working on a plainclothes detail. As the urban renewal group passed the officer, defendant stopped and began to stare at him. When Cherski looked back and made eye contact with defendant, defendant asked what Cherski was staring at. Cherski responded

---

[27] Defendant does not suggest his conduct in the county jail incident did not constitute a violent crime or a threat to commit a violent crime. (See, e.g., § 241.1.)

that he was not staring at anything. Defendant approached Cherski and told him, "I will fuck you up." Cherski then identified himself as a police officer and arrested defendant.

Characterizing the encounter involving Officer Cherski as "nothing more than a non-specific future threat," defendant contends the evidence was not admissible under factor (b) as criminal activity involving "the use or attempted use of force or violence or the express or implied threat to use force or violence." The record shows otherwise. (See §§ 240 [defining crime of assault], 422 [elements of criminal threats].)

As he did in challenging the evidence concerning the county jail incident, defendant asserts it was error to allow the jury to consider evidence of the encounter with Officer Cherski when the actual crime was not identified and the jury was not instructed on its elements. As previously discussed, *ante,* in part II.D.5.c., these omissions neither rendered the evidence inadmissible nor constituted instructional error.

### 6. *Instructions on considering unadjudicated criminal activity*

In instructing on the evidence of unadjudicated criminal activity admitted under factor (b), the trial court informed the jury: "Before a juror may consider any of such criminal act or activity as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal act or activity. . . . [¶] If any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a fact in aggravation. If a juror is not so convinced, that juror must not consider that evidence for any purpose." (CALJIC No. 8.87 (1989 rev.) (5th ed. 1988) pars. 2, 3.) In connection with this charge, the trial court also instructed with the second paragraph of CALJIC No. 2.90, which defines the reasonable doubt standard.

Defendant claims the trial court erred when instructing the jury on how to consider the evidence of unadjudicated criminal activity because it omitted the first paragraph of the standard reasonable doubt instruction, which would have informed the jury about the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt.[28]

We reject defendant's claim. As we have previously made clear, when, as here, the jury is instructed it may consider evidence of unadjudicated criminal

---

[28] The first paragraph of CALJIC No. 2.90 states: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether [his] [her] guilt is satisfactorily shown, [he] [she] is entitled to a verdict of not guilty. The presumption places upon the People the burden of proving [him] [her] guilty beyond a reasonable doubt."

activity as a factor in aggravation only after being convinced beyond a reasonable doubt that the defendant committed the alleged criminal activity, no more is required. (*People v. Prieto, supra*, 30 Cal.4th at p. 263; *People v. Benson* (1990) 52 Cal.3d 754, 810 [276 Cal.Rptr. 827, 802 P.2d 330] [the reasonable doubt standard in this setting provides the substance of the presumption of innocence and the prosecution's burden of proof].)

Defendant argues that the failure to instruct on the presumption of innocence and the prosecution's burden of proof was error here because the trial court misinformed the jury by remarking, "In this type of a proceeding, there are many rules of evidence that don't apply because, remember, we are not talking about guilty beyond a reasonable doubt." Contrary to defendant's assertion, the trial court's comment was not a misstatement of law. "[T]he focus of the penalty selection phase of a capital trial is more normative and less factual than the guilt phase. The penalty jury's principal task is the moral endeavor of deciding whether the death sentence should be imposed on a defendant who has already been determined to be 'death eligible' as a result of the findings and verdict reached at the guilt phase." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1267 [74 Cal.Rptr.2d 212, 954 P.2d 475].) Furthermore, given the entire charge, it is not reasonably likely the jury understood the trial court's comment as a call to ignore the given instruction on the reasonable doubt standard applicable to evidence of unadjudicated criminal activity. Defendant's suggestion to the contrary is not persuasive on this record.

### 7. Instruction on the jury's sentencing discretion and deliberative process (CALJIC No. 8.88)

Before the penalty retrial deliberations, the trial court read CALJIC No. 8.88, which described the process of weighing the factors in aggravation and mitigation to arrive at the penalty determination. In relevant part, the instruction stated that to impose death, the jury must be persuaded "that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." Defendant contends the standard instruction is constitutionally infirm in various respects. As he acknowledges, in prior decisions we have rejected identical assertions. CALJIC No. 8.88's reference to aggravating circumstances that are "so substantial" is not impermissibly vague, and its description of the jury's central duty as determining whether death is "warranted," rather than "appropriate," is not misleading. (*People v. Carrington, supra*, 47 Cal.4th at p. 199; *People v. Bramit, supra*, 46 Cal.4th at p. 1249.) Nor is the instruction defective because it fails to convey to jurors that defendant has no burden to persuade them that death is inappropriate. (*People v. Parson* (2008) 44 Cal.4th 332, 371 [79 Cal.Rptr.3d 269, 187 P.3d 1].) Finally, CALJIC

No. 8.88 is not inconsistent with section 190.3's mandate or the requirements of due process in failing to inform jurors that they "shall impose" a sentence of life without parole in the event the mitigating circumstances outweigh those in aggravation. (*People v. Jackson* (2009) 45 Cal.4th 662, 701–702 [88 Cal.Rptr.3d 558, 199 P.3d 1098]; *People v. Carter* (2005) 36 Cal.4th 1215, 1279 [32 Cal.Rptr.3d 838, 117 P.3d 544].) Defendant fails to persuade us to revisit these issues.

### 8. *Off-the-record proceedings*

After trial ended and the parties had reviewed the trial transcripts, defendant's appellate counsel asked the trial court for permission to prepare a settled statement on oral trial proceedings the court reporter did not record. (See Cal. Rules of Court, former rules 4(e), 7, 36, now rules 8.137, 8.346.) The written request referenced 83 unreported matters. Following both formal and informal discussions by the parties and a court hearing, the trial court ordered inclusion in the record of 27 settled statements. Regarding the unreported proceedings that could not be settled, defendant's appellate counsel and respondent's counsel stipulated that, as to some, the parties had no independent recollection, and as to the others, the request for a settled statement had been denied or withdrawn.

Citing the items that are not part of the record as settled statements and other unreported discussions, defendant now claims the trial court violated section 190.9 by holding numerous pretrial and trial proceedings without a court reporter present. In relevant part, section 190.9 provides: "In any case in which a death sentence may be imposed, all proceedings conducted in the superior court, including all conferences and proceedings, whether in open court, in conference in the courtroom, or in chambers, shall be conducted on the record with a court reporter present." (§ 190.9, subd. (a)(1).)

Although, as defendant argues, the trial court apparently failed to comply with section 190.9, the error is not reversible because defendant has failed to carry his " 'burden of demonstrating that the appellate record is not adequate to permit meaningful appellate review.' " (*People v. Freeman, supra*, 8 Cal.4th at p. 509.) As to most of the cited instances of unreported proceedings, which include matters such as discussion in chambers scheduling meetings, and sidebar conferences during witness testimony, defendant makes no effort to establish prejudice or even to place the unreported exchanges in context. (*People v. Harris, supra*, 43 Cal.4th at p. 1281.) Although defendant suggests the trial court's practice of discussing jury instructions off the record "raises red flags," he acknowledges the trial court recited for the record the parties' instructional objections. And although he contends the trial court's summary of the parties' arguments was truncated and incomplete, he fails to explain

how the unreported discussions prevent us from conducting an adequate review of the jury instructions the trial court gave or refused. (*People v. Rundle, supra*, 43 Cal.4th at pp. 110–112.)

Nor does defendant describe how he was prejudiced by the trial court's off-the-record discussions with counsel regarding four questions the first jury posed during its penalty phase deliberations. As above, the trial court summarized the unreported conference on the record, including the parties' various objections and its rulings, and nothing in the record suggests counsel disagreed with the trial court's summation. Defendant fails to demonstrate any way in which the unreported discussion hampers appellate review. (*People v. Dykes* (2009) 46 Cal.4th 731, 800, fn. 16 [95 Cal.Rptr.3d 78, 209 P.3d 1].) Indeed, given that the first jury deadlocked on penalty, it is unclear how defendant could show the off-the-record discussion prejudiced him.

Defendant properly concedes he cannot demonstrate he suffered prejudice as a result of the trial court's failure to comply with section 190.9. But he urges us to reconsider the rule that places on him the burden of showing prejudice, and to declare instead that a trial court's violation of section 190.9 is reversible per se. We declined a similar invitation in *People v. Rogers, supra*, 39 Cal.4th at page 860, and do so again here.

■ We also reject defendant's assertion that the trial court's failure to conduct all proceedings in the presence of a court reporter violated his rights to due process and fair trial under the Fourteenth Amendment. The due process clause requires the state "to furnish an indigent defendant with a record sufficient to permit an adequate and effective appellate review. [Citations.]" (*People v. Rogers, supra*, 39 Cal.4th at p. 857.) Where, as here, the procedures for using settled statements are used to fill in the gaps and the resulting record is "adequate to permit meaningful appellate review" (*People v. Howard* (1992) 1 Cal.4th 1132, 1165 [5 Cal.Rptr.2d 268, 824 P.2d 1315]), there is no due process violation (*People v. Osband* (1996) 13 Cal.4th 622, 661–663 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People v. Hawthorne* (1992) 4 Cal.4th 43, 66–67 [14 Cal.Rptr.2d 133, 841 P.2d 118]). Nor, contrary to defendant's assertion, did the violation of section 190.9 deprive defendant of his Eighth Amendment right to a reliable death penalty determination. (*People v. Rogers, supra*, at pp. 857–858.) Finally, we reject defendant's remaining argument that the violation of section 190.9 constituted a deprivation of a state-created liberty interest under *Hicks v. Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227]. Defendant cites no case, and we are aware of none, that suggests a capital defendant has a constitutionally protected liberty interest in the presence of a court reporter at every oral exchange that occurs during the pendency of his case. (*Engle v. Isaac* (1982)

456 U.S. 107, 121, fn. 21 [71 L.Ed.2d 783, 102 S.Ct. 1558] [mere error of state law is not a denial of due process].) *Hicks* is not implicated here.

### 9. *Challenge to the felony-murder special circumstances*

Defendant contends his death sentence violates the proportionality guarantee of the Eighth Amendment because he was rendered death eligible on the basis of his commission of three felonies, with no requirement that the prosecution prove any culpable mental state as to the killing. He argues that imposition of the death penalty for negligent or accidental killings is contrary to the laws of a majority of the states, recent professional opinion, and international norms, and is therefore inconsistent with the evolving standards of decency from which the Eighth Amendment derives its meaning.

As defendant acknowledges, we have repeatedly held that, consistent with Eighth Amendment principles, neither intent to kill nor reckless indifference to life is a required element of the felony-murder special circumstance when the defendant is the actual killer. (*People v. Young, supra*, 34 Cal.4th at p. 1204; *People v. Hayes, supra*, 52 Cal.3d at p. 632; see also *People v. Brasure* (2008) 42 Cal.4th 1037, 1071–1072 [71 Cal.Rptr.3d 675, 175 P.3d 632] [rejecting the argument that Western Europe's abolition of the death penalty demonstrates evolving standards of decency so as to bar capital punishment under the 8th Amend.].) Defendant offers nothing to warrant our reconsideration of the issue. For similar reasons, we reject defendant's contention that the high court's recent pronouncements on the Sixth Amendment jury trial right require the jury, not the courts, to make the requisite findings of intent to kill or reckless indifference to life. The Eighth Amendment does not require such a finding. Thus, there is no requirement the jury be instructed to do so.

We likewise reject defendant's contention that imposing the death penalty absent a showing of intent to kill violates international law as set forth in the International Covenant on Civil and Political Rights, December 16, 1966 (ICCPR), and in a resolution by the United Nations Economic and Social Council. "We need not consider the applicability of international treaties and laws to defendant's appeal . . . because he has failed to establish his premise that he suffered violations of state or federal constitutional law." (*People v. Wallace, supra*, 44 Cal.4th at p. 1098; see *People v. Mungia* (2008) 44 Cal.4th 1101, 1142 [81 Cal.Rptr.3d 614, 189 P.3d 880] [no violation of ICCPR when death sentence is imposed in accordance with law].)

### 10. *Challenges to California's death penalty law*

Defendant advances "routine instructional and constitutional challenges" to California's death penalty statute (*People v. Schmeck* (2005) 37 Cal.4th 240,

303 [33 Cal.Rptr.3d 397, 118 P.3d 451]), all of which we have consistently rejected in prior decisions. We reaffirm our prior pronouncements as follows:

California's death penalty scheme is not unconstitutional in failing to assign to the state the burden of proving beyond a reasonable doubt the existence of an aggravating factor. (*People v. Whisenhunt, supra*, 44 Cal.4th at p. 227; *People v. Zamudio, supra*, 43 Cal.4th at p. 373.) Nor does any constitutional provision require an instruction informing jurors they may impose a sentence of death only if persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors and that death is the appropriate penalty. (*People v. Hawthorne, supra*, 46 Cal.4th at p. 104; *People v. Lewis, supra*, 43 Cal.4th at p. 533.) Recent high court decisions interpreting the Sixth Amendment right to jury trial—*Apprendi, supra*, 530 U.S. 466, *Ring v. Arizona, supra*, 536 U.S. 584, and *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]—do not undermine our prior conclusions. (See *People v. Bramit, supra*, 46 Cal.4th at p. 1250 & fn. 22.)

The failure to instruct the jury that the prosecution bears some burden of persuasion regarding the jury's penalty determination does not violate the Sixth, Eighth or Fourteenth Amendment. (*People v. Friend* (2009) 47 Cal.4th 1, 89 [97 Cal.Rptr.3d 1, 211 P.3d 520]; *People v. Wilson, supra*, 43 Cal.4th at p. 31.)

Nor does the failure to instruct jurors they must unanimously agree on the existence of particular aggravating factors, but not on the existence of any mitigating factors, violate the Sixth, Eighth, or Fourteenth Amendment. (*People v. McWhorter, supra*, 47 Cal.4th at p. 378; *People v. Butler* (2009) 46 Cal.4th 847, 875 [95 Cal.Rptr.3d 376, 209 P.3d 596]; see also *People v. Prieto, supra*, 30 Cal.4th at p. 275 [constitutionality of death penalty law not undercut by reasoning of *Ring v. Arizona, supra*, 536 U.S. 584].)

There is no constitutional requirement that a trial court instruct the jury on the " 'presumption of life.' " (*People v. Whisenhunt, supra*, 44 Cal.4th at p. 228.)

The lack of a requirement that the jury make a written statement of its findings and its reasons for the death verdict does not deprive a capital defendant of the rights to due process, equal protection, and meaningful appellate review that derive from the Fifth, Eighth, and Fourteenth Amendments. (*People v. Farley* (2009) 46 Cal.4th 1053, 1134 [96 Cal.Rptr.3d 191, 210 P.3d 361]; *People v. Wilson, supra*, 43 Cal.4th at p. 32.)

The failure to provide intercase proportionality review does not violate the Eighth and Fourteenth Amendments. (*People v. Avila, supra*, 46 Cal.4th at

p. 724; see also *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871] [intercase proportionality review not constitutionally required].)

When a death sentence is rendered in accordance with state and constitutional law, international law does not bar imposition of the death penalty. (*People v. Whisenhunt, supra*, 44 Cal.4th at p. 228; *People v. Wallace, supra*, 44 Cal.4th at p. 1098.) Nor does "California's asserted status as being in the minority of jurisdictions worldwide that impose capital punishment" render California out of step with evolving standards of decency or otherwise establish that its death penalty scheme per se violates the Eighth Amendment. (*People v. Thornton, supra*, 41 Cal.4th at p. 470; see *People v. Moon, supra*, 37 Cal.4th at pp. 47–48.)

### 11. *Effect of reversals on death sentence*

Pointing out that the trial court instructed the penalty retrial jurors to base their determination on "[t]he circumstances of the crime of which the defendant was convicted" (§ 190.3, factor (a)), defendant argues that in the event we reverse or reduce any conviction or special circumstance finding, we must also reverse his death sentence. He contends that reversal of penalty is required because the reversal of a count or finding would "alter the landscape" the jurors considered in determining penalty, and that reversal is mandated moreover by the Sixth Amendment principles enunciated in *Apprendi, supra*, 530 U.S. 466, and its progeny, which hold that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490.)

Because we affirm all of the convictions and findings against defendant, we need not reexamine whether it is proper to conduct harmless error review when an appellate court reverses or vacates a conviction or finding the jurors considered in determining penalty.

### 12. *Cumulative error*

Finally, we reject defendant's contention that the combined effect of the errors occurring at both the guilt and penalty phases of trial so infected his trial with unfairness as to make his resulting conviction a violation of due process and his death sentence unreliable. There was no error reversible by itself, and any errors that did occur, viewed collectively, do not constitute a constitutional deprivation. Contrary to defendant's argument, he received a fair trial. (*People v. Thornton, supra*, 41 Cal.4th at p. 470.)

## CONCLUSION

For the foregoing reasons, we affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied June 9, 2010.